# United States Court of Appeals
## For the First Circuit

---

No. 08-1344

UNITED STATES,

Appellee,

v.

TAMMY LEVESQUE,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., <u>U.S. District Judge</u>]

---

Before

Lynch, <u>Chief Judge</u>,
Torruella and Stahl, <u>Circuit Judges</u>.

---

<u>Virginia G. Villa</u>, Assistant Federal Defender, for appellant.
<u>Renee M. Bunker</u>, Assistant United States Attorney, with whom
<u>Paula D. Silsby</u>, United States Attorney, was on brief for appellee.

---

October 30, 2008

---

**LYNCH**, **Chief Judge**.  This appeal challenges a $3,068,000 money judgment imposed on defendant Tammmy Levesque, a "mule" in a marijuana distribution conspiracy.  Levesque argues this money judgment forfeiture exceeds the bounds of 21 U.S.C. § 853, that it is improperly calculated in light of the Supreme Court's recent discussion of the term "proceeds" in United States v. Santos, 128 S. Ct. 2020 (2008), and that it violates the Eighth Amendment's Excessive Fines Clause.

                                   I.

        On October 10, 2006, Levesque was stopped for speeding on I-95, in Pittsfield, Maine, by Maine State Police.  Levesque's Chevrolet Avalanche had been under surveillance by federal agents after Immigration and Customs Enforcement received information that Levesque was involved in a large marijuana distribution operation.  As the trooper ran Levesque's license and registration, another trooper arrived with a K-9 dog, who alerted to the bed of the pickup truck.  When Levesque was asked if there was anything she wanted to say, she responded, "I'm not going to lie to you, it is in the back."  "It" turned out to be ninety-four pounds of marijuana in three duffel bags.

        Levesque was arrested; she admitted to having made marijuana distribution runs two to three times per week since February 2006.  She stated that the marijuana was transported across the Canadian border in a secret compartment of a tractor

                                  -2-

trailer, and that she would meet the driver of the trailer in Ashland, Maine, to receive her shipments. Levesque would deliver the marijuana to locations in Massachusetts, New Jersey, Connecticut, and North Carolina, and would return to Madawaska, Maine, with large bags of cash.

On October 31, 2007, Levesque pled guilty to conspiracy to possess with intent to distribute 100 kilograms or more of marijuana, see 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 846. The Information included a forfeiture allegation, pursuant to 21 U.S.C. § 853. Levesque agreed in her plea "to waive any claim to, and assist the United States in effectuating the forfeiture . . . of, any property that may be subject to forfeiture to the United States," including the vehicle that Levesque had used to transport the drugs and "a money judgment in an amount to be determined by the Court."

The government moved for a preliminary order of forfeiture, asking the district court to award it a money judgment in the amount of $3,068,000. To reach this figure, the government assumed, based roughly on Levesque's admissions, that Levesque had transported forty pounds of marijuana per trip and that she had made two trips per week for eighteen weeks; it added the ninety-four pounds Levesque was carrying when she was arrested, and multiplied the total, 1,534 pounds of marijuana, by a "conservative discounted price" of $2,000 per pound.

Levesque objected that a forfeiture could not take the form of a money judgment and that the amount should be reduced.[1] She argued, first, that § 853 does not authorize the imposition of a money judgment. Second, she urged the court to reduce the amount of her forfeiture considering her relative culpability, what she earned from her role in the conspiracy, and her ability to pay in setting the forfeiture amount. For her work as a drug runner, Levesque was paid $2,000 per trip; assuming she made two trips per week and worked for eighteen weeks, her gross pay was $72,000. She used this money to purchase the automobile she used for the drug runs and for various travel expenses. All told, Levesque estimated she made a total of $37,284.08 from her illegal activities. A single mother and high school dropout, who had been largely unemployed since 2005, Levesque spent this money primarily on living expenses for herself and her son and on an attempt to open a beauty salon in Madawaska. As such, she claimed, "she ha[d] nothing of value left to forfeit." Levesque conceded that the court could impose a forfeiture on one conspirator for the full foreseeable proceeds of the conspiracy, see United States v. Candelaria-Silva, 166 F.3d 19, 44 (1st Cir. 1999), such that the forfeiture amount was not capped by her own personal proceeds. But she argued nonetheless that a reasonable money judgment would

---

[1] Levesque had "no objection to the entry of a preliminary order of forfeiture to the motor vehicle listed in the Information."

account for the "<u>net</u> proceeds [she] derived from her role in the offense, as well as [the] other mitigating factors."

The district court rejected Levesque's objections and entered a preliminary order of forfeiture for the full $3,068,000. First, the court found it was clear under First Circuit precedent that § 853 authorized the imposition of a money judgment. Second, it concluded that the $3,068,000 forfeiture was not disproportionate, notwithstanding Levesque's role in the conspiracy, the amount she actually earned, or her inability to pay. In determining the extent of a money judgment, it said a court is not required

> to measure each co-conspirator's separate role within the overall conspiracy in generating illegal proceeds, to assess the distinct impact a defendant's actions within the greater conspiracy had on her own finances, to make value judgments about the actual use of ill-gotten gains, [or] to perform accounting-like determinations of the profit and expense ratios from the conspiracy.

"[T]he forfeiture statute nowhere suggests that a court should delve into an individual defendant's personal finances," and to do so "would be an exercise fraught with evidentiary difficulty ending in legal futility." Moreover, even if the court could effectively make such calculations, doing so would not be appropriate in this case. As a courier for drugs and money, Levesque played an "essential" role in the conspiracy. Regardless of Levesque's pay, it was reasonable to hold her liable for the foreseeable proceeds

of the conspiracy. Levesque admitted to distributing large quantities of marijuana for the conspiracy, and the government was quite conservative in calculating the value of these distributions, "[giving] Ms. Levesque the benefit of every doubt." Finally, it was of no concern that "there is no sign that Ms. Levesque can begin to pay such a money judgment." Money judgments run into the future, the court noted, so if the defendant "is fortunate in the future to legitimately come into money, the Government would have a right within certain constraints to extract its share of her good fortune."

The district court sentenced Levesque to twenty-three months' imprisonment on March 7, 2008, and the forfeiture order became final three days later. Levesque timely appealed.

## II.

Levesque raises three challenges on appeal to the $3,068,000 forfeiture order. First, she renews her assertion that money judgments are impermissible under 21 U.S.C. § 853. Second, she argues that in light of the Supreme Court's intervening decision in Santos, the district court erred in calculating the forfeiture amount. Levesque argues that Santos requires that the "proceeds" forfeitable under § 853 be determined according to net profits rather than gross receipts. Third, she argues that the imposition of the forfeiture violates the Excessive Fines Clause of the Eighth Amendment.

-6-

Levesque's first argument is unavailing.  As the district court properly noted, the law is clear that § 853 authorizes money judgments.  United States v. Hall, 434 F.3d 42, 58-59 (1st Cir. 2006); accord, e.g., United States v. Day, 524 F.3d 1361, 1377-78 (D.C. Cir. 2008); United States v. Casey, 444 F.3d 1071, 1077 (9th Cir. 2006).

Her second argument, regarding the definition of "proceeds" after Santos, requires more careful consideration.  The federal drug forfeiture statute, 21 U.S.C. § 853, provides in relevant part that:

> Any person convicted of a violation of this subchapter . . . punishable by imprisonment for more than one year shall forfeit to the United States . . . any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation . . . .

Id. § 853(a) (emphasis added).  In determining Levesque's forfeiture under this statute, the district court interpreted "proceeds" as receipts rather than profits.  It calculated the forfeiture according to the gross retail value of the marijuana that Levesque transported, refusing to take into account the expenses associated in Levesque's distribution runs.  The court's interpretation was supported by existing precedent.  In United States v. Hurley, 63 F.3d 1 (1st Cir. 1995), we explicitly rejected the argument that "proceeds" meant net profits in the forfeiture

-7-

context.[2]  Id. at 21-22.  We pointed to legislative history that explained that Congress chose "the term 'proceeds' . . . in lieu of the term 'profits' in order to alleviate the unreasonable burden on the government of proving net profits."  Id. at 21 (quoting S. Rep. No. 98-225, at 199 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3382) (internal quotation marks omitted).  We concluded that, in light of this and other considerations, "the broader definition of 'proceeds' seems to us a rather easy call."  Id.

The question is whether this "easy call" remains as clear following the Supreme Court's decision in Santos.  In Santos, the Court ruled, under the rule of lenity, that the term "proceeds" in the federal money-laundering statute, 18 U.S.C. § 1956(a)(1), should be interpreted as "profits" rather than "receipts," at least when the predicate offense is an illegal lottery operation,[3] 18

---

[2]  Hurley involved an application of the analogous RICO forfeiture statute, 18 U.S.C. § 1963, rather than an application of the drug forfeiture statute, 21 U.S.C. § 853.  However, the relevant language in 18 U.S.C. § 1963 is essentially identical to that in 21 U.S.C. § 853.  The two forfeiture statutes were intended to parallel one another closely, and case law interpreting either one has been applied as to the other.  United States v. White, 116 F.3d 948, 950 (1st Cir. 1997).  Other circuits had also held more directly that "proceeds" in § 853 refers to gross proceeds rather than profits.  See United States v. Casey, 444 F.3d 1071, 1076 n.4 (9th Cir. 2006); United States v. Keeling, 235 F.3d 533, 537 (10th Cir. 2000); United States v. McHan, 101 F.3d 1027, 1041-43 (4th Cir. 1996).

[3]  Justice Scalia's plurality opinion is at odds with Justice Stevens's concurrence -- which represented the necessary fifth vote for the judgment -- over whether this interpretation of the statute applies in the context of other predicate offenses. The plurality argues that the problem apparent in Santos "is not

-8-

U.S.C. § 1955. See Santos, 128 S. Ct. at 2025 (plurality opinion); id. at 2033-34 (Stevens, J., concurring in the judgment). Levesque urges that this ruling requires a similar interpretation of "proceeds" in 21 U.S.C. § 853. Such a conclusion would require the district court to recalculate its forfeiture determination and possibly to make further factual findings.

Levesque first called this court's attention to the newly decided Santos in her reply brief. The district court had no opportunity to consider it. The Supreme Court's decision in Santos was issued about half a year after the district court's preliminary order of forfeiture and a few days after Levesque submitted her opening brief in the present case. We raised the question at oral argument whether it would be preferable to have this issue addressed in the first instance by the district court. By letter dated October 15, 2008, the United States, in the best traditions of a federal prosecutor's office, informed this court it would consent to such a remand. Levesque similarly consented, in a letter dated October 16, 2008. Accordingly, we remand to the

limited to lottery operators," and that its interpretation of "proceeds" in § 1956 should apply regardless of the predicate offense. See Santos, 128 S. Ct. at 2026, 2030 (plurality opinion). Justice Stevens, on the other hand, argues that "th[e] Court need not pick a single definition of 'proceeds' applicable to every unlawful activity" to which § 1956 applies. Id. at 2032 (Stevens, J., concurring in the judgment). Thus, he would hold that "proceeds" means "profits" in the context of a § 1955 violation, but that this is not necessarily the case in the context of other predicate offenses. See id. at 2032 & n.3.

district court for consideration in the first instance of whether and to what extent the ruling in Santos affects the forfeiture determination in this case.

We turn to Levesque's third argument, regarding excessiveness under the Eighth Amendment. Here again there is pertinent recent case law that was not brought to the attention of the district court and which should be considered there in the first instance since the case is being remanded.

A criminal forfeiture is unconstitutional under the Excessive Fines Clause if it is "grossly disproportional to the gravity of the defendant's offense." United States v. Bajakajian, 524 U.S. 321, 337 (1998); United States v. Jose, 499 F.3d 105, 111 (1st Cir. 2007); United States v. Heldeman, 402 F.3d 220, 223 (1st Cir. 2005); Candelaria-Silva, 166 F.3d at 44. To determine whether a forfeiture is grossly disproportional, a court should consider:

> (1) whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (2) other penalties authorized by the legislature (or the Sentencing Commission); and (3) the harm caused by the defendant.

Heldeman, 402 F.3d at 223.

The district court rejected Levesque's argument that the forfeiture should be decreased in light of Levesque's allegedly minor role in the conspiracy. It found that the imposition on Levesque of the full forfeiture amount, based on the foreseeable proceeds of the conspiracy, was rational under a proportionality

-10-

analysis.  The court thus appears to have properly concluded that a forfeiture based on vicarious but foreseeable liability, rather than on a defendant's particular role in a conspiracy, is not "grossly disproportional," in violation of the Excessive Fines Clause.  See Candelaria-Silva, 166 F.3d. at 44-45; Hurley, 63 F.3d at 22-23.

In reaching this conclusion, the court also found that it was unnecessary for it to "delve into [Levesque's] personal finances" or to consider Levesque's inability to satisfy a $3,068,000 forfeiture.  The court was correct to the extent that the effect of a forfeiture on a particular defendant is not pertinent under the three-part test for gross disproportionality described in Heldeman; this test focuses on the relationship between the offense and the forfeiture, not the relationship between the forfeiture and the offender.

However, as this court stated in Jose, this test is not the end of the inquiry under the Excessive Fines Clause.  Beyond the three factors described in Heldeman, a court should also consider whether forfeiture would deprive the defendant of his or her livelihood.  Jose, 499 F.3d at 113; see also Bajakajian, 524 U.S. at 340 n.15 (treating as distinct the question of whether a forfeiture would deprive a defendant of his livelihood).[4]

---

[4]     In so holding, we are at odds with the Eleventh Circuit, which has stated that "we do not take into account the personal impact of a forfeiture on the specific defendant in determining

-11-

The Supreme Court has made it clear that the notion that a forfeiture should not be so great as to deprive a wrongdoer of his or her livelihood is deeply rooted in the history of the Eighth Amendment. Bajakajian, 524 U.S. at 335. Bajakajian described that history. The Excessive Fines Clause was taken verbatim from the English Bill of Rights of 1689; "[t]hat document's prohibition against excessive fines was a reaction to the abuses of the King's judges during the reigns of the Stuarts." Id. (citing Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 267 (1989)). Specifically, these judges were accused of subverting the requirement, under Magna Charta, that "amercements (the medieval predecessors of fines) should be proportioned to the offense and that they should not deprive a wrongdoer of his livelihood." Id. The King's judges imposed "ruinous fines on wrongdoers and critics of the Crown." Browning-Ferris, 492 U.S. at 290 (O'Connor, J., concurring in part and dissenting in part); id. at 267 (majority opinion). As these fines became more excessive, "some opponents of the King" -- including several who would later help draft the 1689 Bill of Rights -- "were forced to remain in prison because they could not pay the huge monetary penalties that

---

whether the forfeiture violates the Eighth Amendment." United States v. Dicter, 198 F.3d 1284, 1292 n.11 (11th Cir. 1999) (upholding a forfeiture imposed under 21 U.S.C. § 853); see also United States v. 817 N.E. 29th Drive, 175 F.3d 1304, 1311 (11th Cir. 1999) (holding, under Bajakajian, that "excessiveness is determined in relation to the characteristics of the offense, not in relation to the characteristics of the offender").

-12-

had been assessed." Id. at 267 (citing L. Schwoerer, The Declaration of Rights, 1689, at 91 (1981)).

The provision of the Magna Charta which was subverted by these abuses stated that:

> A Free-man shall not be amerced for a small fault, but after the manner of the fault; and for a great fault after the greatness thereof, saving to him his contenement; (2) and a Merchant likewise, saving to him his merchandise; (3) and any other's villain than ours shall be likewise amerced, saving his wainage.

Magna Charta, 9 Hen. III, ch. 14 (1225), 1 Stat. at Large 6-7 (1762 ed.) (emphases added).

As explained by one commentator (who is cited extensively by the Court in its historical discussion in Browning-Ferris), "the great object" of this provision was that "[i]n no case could the offender be pushed absolutely to the wall: his means of livelihood must be saved to him." W. McKechnie, Magna Carta 287 (2d ed. 1914); see also C. Massey, The Excessive Fines Clause and Punitive Damages: Some Lessons from History, 40 Vand. L. Rev. 1233, 1259-60 & n.154 (1987). Accordingly, under Magna Charta, after "the amount of an amercement was initially set by the court," "[a] group of the amerced party's peers would then be assembled to reduce the amercement in accordance with the party's ability to pay." Browning-Ferris, 492 U.S. at 289 (O'Connor, J., concurring in part and dissenting in part) (citing McKechnie, supra, at 288-89); see also McKechnie, supra, at 288 (describing the two steps involved in

-13-

fixing an amercement and relating an example in which an offender's amercement was reduced because of his inability to pay).  This limitation inhered regardless of the relationship between the amercement and the gravity of the offense.  Massey, supra, at 1260 n.154.

This history, as we held in Jose, indicates that a court should consider a defendant's argument that a forfeiture is excessive under the Eighth Amendment when it effectively would deprive the defendant of his or her livelihood.  Such ruinous monetary punishments are exactly the sort that motivated the 1689 Bill of Rights and, consequently, the Excessive Fines Clause.[5] This question is separate from the three-part test for gross disproportionality and may require factual findings beyond those previously made by the district court.  Admittedly, the extra test Jose requires comes from our reading of Bajakajian; Bajakajian itself does not explicitly so hold.

Although we do not define the contours of this inquiry, we note that a defendant's inability to satisfy a forfeiture at the

_____

[5]     In Jose, we found it could not "reasonably be argued that forfeiture of . . . $114,948 would deprive [the] defendant of his livelihood."  Jose, 499 F.3d at 113.  The money, which the defendant had attempted to smuggle out of Puerto Rico, was by the defendant's own admission "not related to efforts to maintain his livelihood."  Id.  In Bajakajian, the Supreme Court did not address this question because the defendant "[did] not argue that his wealth or income are relevant to the proportionality determination or that full forfeiture would deprive him of his livelihood, and the District Court made no factual findings in this respect." Bajakajian, 524 U.S. at 340 n.15 (citation omitted).

time of conviction, in and of itself, is not at all sufficient to render a forfeiture unconstitutional, nor is it even the correct inquiry. Indeed, the purpose of imposing a forfeiture as a money judgment is to "permit[] the government to collect on the forfeiture order in the same way that a successful plaintiff collects a money judgment from a civil defendant. Thus, even if the defendant does not have sufficient funds to cover the forfeiture at the time of the conviction, the government may seize future assets to satisfy the order." Hall, 434 F.3d at 59. We have upheld the enforcement of such money judgments as acceptable under the Excessive Fines Clause. See Candelaria-Silva, 166 F.3d at 44-45. We acknowledge, as the district court pointed out, that even if there is "no sign" that the defendant could satisfy the forfeiture in the future, there is always a possibility that she might be fortunate enough "to legitimately come into money." And it is notable, moreover, that the Attorney General may choose to remit a forfeiture on the grounds of hardship to the defendant. See 19 U.S.C. § 1618; 21 U.S.C. §§ 853(j), 881(d); United States v. Ortiz-Cintrón, 461 F.3d 78, 82 (1st Cir. 2006). Notwithstanding this, it is not inconceivable that a forfeiture could be so onerous as to deprive a defendant of his or her future ability to earn a living, thus implicating the historical concerns underlying the Excessive Fines Clause.

We <u>vacate</u> the district court's forfeiture decision and <u>remand</u> for further consideration consistent with this opinion.