# United States Court of Appeals
## For the First Circuit

No. 10-1460

UNITED STATES,

Appellee,

v.

BEPSY O. AGUASVIVAS-CASTILLO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

Before

Lynch, Chief Judge,
Stahl and Thompson, Circuit Judges.

Anita Hill Adames for appellant.
Myriam Y. Fernandez-Gonzalez, with whom Rosa Emilia
Rodriguez-Velez, United States Attorney, Nelson Pérez-Sosa,
Assistant United States Attorney, and Thomas F. Klumper, Assistant
United States Attorney, were on brief, for appellee.

January 17, 2012

**LYNCH**, <u>Chief Judge</u>.  Bepsy Aguasvivas-Castillo, the owner of a supermarket chain in Puerto Rico, was convicted on one count of conspiracy to commit food stamp fraud and one count of money laundering.  He had engaged in and enlisted his family in an illegal scheme in which the supermarkets he owned and operated provided cash for food stamps beyond Puerto Rico's permissible limits.  Some fourteen defendants were originally charged.  Several, including some of Aguasvivas-Castillo's family members, pled guilty and testified against him.

All told, the supermarkets' illegal receipts from the fraud, conservatively estimated to be over $4 million, were intermingled with over $20 million in food stamp funds.  Aguasvivas-Castillo was sentenced to 108 months in prison and ordered to forfeit the amount of $20 million.  He appeals only from his sentence, arguing that two sentencing guideline enhancements were erroneously applied, and he challenges the amount of the forfeiture order under the Excessive Fines Clause of the Eighth Amendment.  We affirm the district court's application of the sentence enhancements as well as its forfeiture order.

I.

The Food Stamp Program is administered by the U.S. Department of Agriculture's Food and Nutrition Service.  Each year, the Food and Nutrition Service assigns a block grant of approximately $1.5 billion to Puerto Rico's Administration for

-2-

Socioeconomic Development of Families (ASEDF) to provide nutrition assistance to low income families. ASEDF administers Puerto Rico's Program of Nutrition Assistance (NAP), which awards food stamps to families and individuals on a monthly basis in an amount based on the family's number of dependents and overall income.

NAP deposits the monthly food stamp amount for each family or individual onto an Electronic Benefit Transfer (EBT) debit card, which can then be used to purchase food at NAP-certified establishments. Food stamp recipients in Puerto Rico are permitted to withdraw 25% of the amount deposited on their EBT-debit cards as cash for purchases of food at other establishments, but they may not use the remaining 75% to get cash. This restriction was implemented by Puerto Rico and the U.S. Department of Agriculture to try to reduce instances of fraud and error in Puerto Rico's food stamp program. See Food and Nutrition Serv., U.S. Dep't of Agric., Implementing Supplemental Nutrition Assistance Program in Puerto Rico: A Feasibility Study 71 (2010) [hereinafter "Implementing SNAP in Puerto Rico"]; Office of Mgmt. and Budget, Detailed Information on the Nutrition Assistance for Puerto Rico Assessment ¶ 3.7 (2005).

Not all food retailers in Puerto Rico are NAP-certified, so one purpose of the 25% cash allowance is to allow participants without ready access to certified retailers a way to purchase food elsewhere. Implementing SNAP in Puerto Rico 71. While the program

requires that the cash be used only to purchase eligible food items, actual use of the cash is unmonitored. Id.

Businesses wishing to obtain certification to accept food stamps must file an application and submit various documents including a criminal record certificate, use permits, municipal patents, a Treasury Department Certificate of Filed Income Tax Returns for the last five years, and a certificate of incorporation.

When food stamp recipients purchase food at a business that has been certified, the money from their EBT-debit card is automatically transferred to the business's account. This electronic transfer is managed by Evertec Inc., a subcontractor hired by the government to manage the money transfers and store the account data of food stamp participants and certified businesses.

Aguasvivas-Castillo was the president, owner, and sole shareholder of Aguasvivas Food Market, Inc. (AFMI) and Aguasvivas Borinquen, Inc. (ABI). AFMI owned a grocery store located in San Juan, Puerto Rico, and another in Canóvanas, Puerto Rico. ABI owned an additional grocery store in San Juan, Puerto Rico. In 2001, Aguasvivas-Castillo applied for NAP-certification for each of the three supermarkets, and received the certifications in September of 2001. From that point until his indictment in 2007, he owned and operated the three NAP-certified stores, at which food stamp participants could use their EBT-debit cards to obtain food

and cash. The fraudulent scheme started as soon as the certifications issued and only slowed down after the fraud investigation began and a search warrant was served in 2006.

Aguasvivas-Castillo exercised control over the three stores' finances, cash flows, and employment decisions. He also exercised at least some managerial control over store operations and received regular reports from the stores' managers as to sales, deposits, and other financial operations in the three stores.

In 2007, a grand jury indicted Aguasvivas-Castillo and thirteen other defendants for conspiracy to commit food stamp fraud (Count 1), in violation of 7 U.S.C. § 2024(b) and 18 U.S.C. § 371, and for knowingly conducting and attempting to conduct financial transactions affecting interstate commerce involving the proceeds of unlawful activity (Count 2), in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i), and 2. The grand jury indicted all fourteen defendants, including Aguasvivas-Castillo, for committing food stamp fraud; it also indicted Aguasvivas-Castillo and four other defendants for money laundering. The indictment also sought an asset forfeiture of $20 million under each substantive count (Counts 3 and 4). The jury convicted Aguasvivas-Castillo on all counts.

At trial, the government proved that during the length of the four and a half year conspiracy, food stamp recipients used their EBT-debit cards to obtain cash in excess of the 25% limit at

Aguasvivas-Castillo's three stores. In exchange for this illegal service, Aguasvivas-Castillo and his co-conspirators profited: they collected a commission of approximately 20-25% of every $100 cashed. Their commissions totaled, at a minimum, $4,440,744.29.

Aguasvivas-Castillo waived the right to have the asset forfeiture determinations made by the jury and asked the court to make the final forfeiture determinations. The court held the forfeiture hearing on September 19, 2008.

The government argued that under 18 U.S.C. §§ 981 and 982, the total forfeitable amount was at least $20 million. Under § 982, the court "shall order that [a person convicted under 18 U.S.C. § 1956] forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." 18 U.S.C. § 982(a)(1). The government argued that Aguasvivas-Castillo should forfeit $20 million under 18 U.S.C. § 982 because that was the total sum involved in the fraud.

In fact, the stores received $28,038,985.98 (not $20 million) in government food stamp funds over the course of the conspiracy, which Aguasvivas-Castillo placed in six different accounts. Aguasvivas-Castillo intermingled and concealed the fraudulent food stamp proceeds within the total sum of $28 million in these accounts, in order to shield the fraud. Throughout the conspiracy, Aguasvivas-Castillo regularly withdrew cash from these

accounts to operate the cash-intensive food stamp fraud/money laundering venture.

Aguasvivas-Castillo argued at the forfeiture hearing that because there was no way to quantify the total fraudulent amount, he should not be ordered to forfeit $20 million. He also initially argued that the fraudulent amount was $24,310 at most.

After permitting the parties to submit additional briefing, the district court entered a preliminary order of forfeiture on October 30, 2008. The court found that the United States had proven by a preponderance of the evidence that the amount of $20 million constituted "proceeds traceable to the conspiracy to commit food stamp fraud . . . [and] money laundering," and therefore was subject to forfeiture.

In his February 23, 2009, sentencing memorandum, Aguasvivas-Castillo objected to this amount and requested a downward sentence departure and/or variance. He argued that the allegedly criminally-derived funds amounted to no more than $334,493[1] and that any money laundering was "incidental and therefore, de minimis" to the scheme.

The January 27, 2009, pre-sentence report (PSR) recommended that Aguasvivas-Castillo's convictions on Counts 1 and 2 be grouped together pursuant to U.S.S.G. § 3D1.2(d) since both

---

[1] Aguasvivas-Castillo did not account for the difference between this figure and his argument at the sentencing hearing that the fraud amounted to no more than $24,310.

offenses were based on a common loss amount, and that Count 2 be used to determine the calculation under U.S.S.G. § 3D1.3(b) because it produced the highest offense level. It recommended a base offense level of eight under § 2S1.1(a)(2), plus a twenty-level increase under § 2B1.1 based on the total loss amount; a two-level increase under § 2S1.1(b)(2)(B), because Aguasvivas-Castillo was convicted of 18 U.S.C. § 1956; a four-level increase pursuant to U.S.S.G. § 2S1.1(b)(2)(C), because Aguasvivas was in the business of laundering money; and a four-level increase under § 3B1.1(a), because Aguasvivas-Castillo was a leader and organizer in a fraud which involved five or more participants or was otherwise extensive. Thus, with a total offense level of thirty-eight, and a Criminal History Category of I, the PSR calculated Aguasvivas-Castillo's guidelines range as 235 to 293 months of imprisonment.

Aguasvivas-Castillo filed a supplemental objection to the PSR and a motion for reconsideration of the court's preliminary order of forfeiture, in which he argued for the first time that the forfeiture violated the Excessive Fines Clause of the Eighth Amendment on grounds of disproportionality.

On March 5, 2010, the court denied both of Aguasvivas-Castillo's motions, applied the two recommended four-level enhancements and ordered Aguasvivas-Castillo to forfeit $20 million.

For the sentencing calculation, the court relied on § 2S1.1(a) of the Sentencing Guidelines, which calculates the base offense level applicable to money laundering crimes, including theft, property destruction, and fraud. The court applied § 2S1.1(a)(2), which instructs courts to apply a base level of eight "plus the number of offense levels from the table in § 2B1.1 . . . corresponding to the value of the laundered funds" where "the defendant committed the underlying offense . . . but the offense level for the underlying offense is impossible or impracticable to determine." U.S.S.G. § 2S1.1 cmt. n.3(A).

The district court found that the offense level for the fraud was impossible or impracticable to determine because an accurate loss amount from the fraud was impossible to calculate: "it could not be established which of the [NAP] transactions at the three Aguasvivas supermarkets property of defendant were for actual food purchases and which did not involve actual food purchases but were recorded as such."

The court thus used the total value of the laundered, fraudulent funds to determine the number of additional levels to add to Aguasvivas-Castillo's base offense level of eight. In calculating this amount, the court relied on evidence that Aguasvivas-Castillo's stores had conducted 29,486 "food" purchase transactions of $75.00 or more within sixty seconds or less of prior food purchase transactions. Crediting the government's

theory that these transactions could not be legitimate grocery purchases, and that they thus established a minimum loss amount, the court determined that, at a minimum, the fraudulent transactions totaled $4,440,744.29. The court stated that it was "keenly aware that the total amount of money laundered by defendant through his illegal scheme was probably a lot more, . . . given the impossibility to distinguish between the legitimate and illegitimate food purchases and the particular definition of laundered funds applicable to the guideline section at issue." As a result, the court applied eighteen additional levels under U.S.S.G. § 2B1.1(b)(1)(J) to the § 2S1.1(a)(2) base offense level of eight, corresponding to the $4,440,744.29 loss amount, to reach an adjusted base offense level of twenty-six.

The court overruled Aguasvivas-Castillo's objections to the two four-level sentence enhancements, finding, with respect to the § 2S1.1(b)(2)(C) enhancement, that under the totality of the circumstances, Aguasvivas-Castillo was engaged in the business of laundering funds, and further, that with respect to the § 3B1.1(a) enhancement, Aguasvivas-Castillo had exercised a supervisory role over five or more participants in the conspiracy. Based on a calculated offense level of thirty-four and a Criminal History Category of I, the court determined that the advisory guidelines range for both counts, grouped together pursuant to U.S.S.G. § 3D1.2(d), was 151 to 188 months of imprisonment.

Later, at the sentencing hearing, the court gave Aguasvivas-Castillo a downward variance, sentencing him to 60 months of imprisonment as to Count 1, and 108 months of imprisonment as to Count 2, with the two sentences to be served concurrently.

The court also ordered Aguasvivas-Castillo to "forfeit to the United States the amount of $20,000,000 which is the proceeds traceable to the conspiracy to commit food stamps fraud and the money laundered."

II.

Aguasvivas-Castillo, well-represented on appeal, raises three arguments. With respect to his sentence, he challenges the district court's imposition of the two four-level enhancements, one under U.S.S.G. § 3B1.1(a), for Aguasvivas-Castillo's status as a leader or organizer in the offense, and the other under U.S.S.G. § 2S1.1(b)(2)(C), for his being in the business of laundering funds. He also challenges the district court's $20 million forfeiture order under the Eighth Amendment's Excessive Fines Clause.

A.   Sentence Enhancements

We review the district court's interpretation and application of the Sentencing Guidelines de novo and any predicate factual findings for clear error. United States v. Pol-Flores, 644

F.3d 1, 4 (1st Cir. 2011) (quoting United States v. Bailey, 405 F.3d 102, 113 (1st Cir. 2005)).

Aguasvivas-Castillo argues that the court's application of a § 2S1.1(b)(2)(C) four-level sentence enhancement for being in the business of laundering funds should not have been applied to him because he was not "in the business of laundering funds on behalf of others thus gaining financially from engaging in such transactions."

The district court held that under "[t]he totality of the circumstances," Aguasvivas-Castillo "was clearly engaged in the business of laundering funds." The court considered the six factors listed in the Application Notes to § 2S1.1(b)(2)(C) for determining whether a defendant is "in the business of laundering funds": whether the defendant (1) regularly engaged in laundering funds; (2) laundered funds for an extended period of time; (3) laundered funds from multiple sources; (4) generated a substantial amount of revenue in return for laundering funds; (5) had a prior conviction for a money laundering related offense; or (6) made statements during the course of an undercover government investigation that he had engaged in any of the conduct listed in factors (1), (2), (3), or (4). U.S.S.G. § 2S1.1 cmt. n.4(B).

For the first time on appeal, Aguasvivas-Castillo argues that in order for § 2S1.1(b)(2)(C) to apply, the district court was required to determine that he "did not commit the underlying

-12-

offense." See id. § 2S1.1 cmt. n.4(A). Because he was convicted of the underlying offense, food stamp fraud, he argues, the enhancement cannot be applied to him. This is different from his argument to the district court, which was that § 2S1.1(b)(2)(C) should not be applied to him because, under the totality of the circumstances, he was not engaged in the business of laundering funds.

Aguasvivas-Castillo's new argument is either forfeited or waived since he failed to raise it before the district court. United States v. Falu-Gonzalez, 205 F.3d 436, 440 (1st Cir. 2000) (applying this court's waiver rule in the sentencing context). However, even assuming he is entitled to plain error review and his failure to present the argument was not a strategic choice, he nonetheless fails to meet the criteria for relief. See United States v. Olano, 507 U.S. 725, 732-35 (1993).

It is far from clear that there was any error, even had the issue been properly raised. Guideline § 2S1.1(a)(1) applies where the defendant committed the underlying offense or would be accountable for the underlying offense as relevant conduct. Guideline § 2S1.1(a)(2) applies where the defendant did not commit the underlying offense, or where the defendant did commit the underlying offense, "but the offense level for the underlying offense is impossible or impracticable to determine." Id. § 2S1.1 cmt. n.3(A). The latter is true here. The defendant committed the

underlying offense of fraud, but his offense level was impossible or impracticable to determine. Where Guideline § 2S1.1(a)(2) applies, a four-level increase may be imposed if the defendant "was in the business of laundering funds." Id. § 2S1.1(b)(2)(C). However, there is some tension between the text of Guideline § 2S1.1(b)(2)(C) and its Application Notes and legislative history. The text of Guideline § 2S1.1(b)(2)(C) does not limit its application to the first prong of Guideline § 2S1.1(a)(2), where the defendant did not commit the underlying offense. But the Application Notes to Guideline § 2S1.1(a)(2) seem to so limit its application: "The court shall consider the totality of the circumstances to determine whether a defendant who did not commit the underlying offense was in the business of laundering funds, for purposes of subsection (b)(2)(C)." U.S.S.G. § 2S1.1 cmt. n.4(A) (emphasis added).

The Commentary to Amendment 634, which revised § 2S1.1 and consolidated the money laundering guidelines in 2003, purports to further define what is meant, under subsection (b)(2)(C), by "in the business of laundering funds." See U.S.S.G. app. C, vol. II, at 223 (2003). It says, "[t]he Commission determined that, similar to a professional 'fence', see § 2B1.1(b)(4)(B), defendants who routinely engage in laundering funds on behalf of others, and who gain financially from engaging in such transactions, warrant

-14-

substantial additional punishment because they encourage the commission of additional criminal conduct." Id.

Defendant says he was not like a professional fence because his business was selling groceries and not laundering funds for others, and so he should not be punished under § 2B1.1(b)(2)(C).

The parties have cited no case law interpreting this guideline, nor is it obvious what the outcome should be where the same business from which the fraud arose is used to launder the funds, and where a number of co-conspirators commit the fraud and assist each other in laundering the fraudulent proceeds into the business's larger pool of assets in order to hide the fraud. So even if there was an error, we cannot say it was plain under Olano, 507 U.S. at 732-35.

It is also not clear that this issue mattered to the sentence ultimately imposed. The four-level enhancement increased the range from 97 - 121 months to 151 - 188 months. Had this enhancement not been applied, most likely a two-level increase would have been applied under § 2S1.1(b)(2)(B), since Aguasvivas-Castillo was convicted under 18 U.S.C. § 1956. In any event, the district court gave him a significant downward variance, and sentenced him to 108 months. It found 108 months to be the appropriate sentence under 18 U.S.C. § 3553(a).

Aguasvivas-Castillo did challenge in the district court the application of the § 3B1.1(a) four-level enhancement for being "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a).[2] The district court found, and we agree, reviewing the district court's factual findings for clear error, Pol-Flores, 644 F.3d at 4, that the evidence established Aguasvivas-Castillo's supervisory role in the conspiracy.

A defendant acts as a leader where he "exercise[s] . . . some degree or dominance of power in a hierarchy" and has "authority to ensure other persons will heed commands," and he "may be classified as an organizer, though perhaps not as a leader, if he coordinates others so as to facilitate the commission of criminal activity." United States v. Arbour, 559 F.3d 50, 55 (1st Cir. 2009)(quoting United States v. Tejada-Beltran, 50 F.3d 105, 111 (1st Cir. 1995)) (internal quotation marks omitted).

The district court correctly considered the commentary to § 3B1.1 and its non-exhaustive list of seven factors in determining whether the defendant exercised a supervisory role in the offense: (1) the exercise of decision-making authority; (2) the nature of the participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share

---

[2] Aguasvivas-Castillo admirably concedes on appeal: "[t]here is no doubt that more than five-participants [sic] participated in the conduct alleged in the Indictment," so that prong of the test is not at issue.

of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others.  U.S.S.G. § 3B1.1 cmt. n.4; see also Arbour, 559 F.3d at 55.

The evidence clearly established that Aguasvivas-Castillo exercised a supervisory role over the conspiracy regardless of the fact that certain store managers may also have exercised supervisory roles over portions of the conspiracy because they were in charge of the day-to-day operations of the stores.  Aguasvivas-Castillo was the president, owner, and sole shareholder of the two corporations, AFMI and ABI, which owned the three supermarkets.  He certified the supermarkets as NAP-establishments and provided the extensive documentation required.  Although the three stores had their own managers, Aguasvivas-Castillo received regular reports from these managers as to the sales, deposits, and other financial business occurring at the store.  In addition, he exercised control over employment decisions including the hiring, firing, and relocations of the stores' managers.

Significantly, Aguasvivas-Castillo also controlled the finances for the three stores.  He was the sole signatory of the stores' bank accounts, and exercised control over each account.  He received bank statements for the three accounts and prepared the tax returns for the two holding corporations.

Aguasvivas-Castillo well knew about the illegal operations. He was present on a number of occasions when illegal food stamp transactions were being conducted, and he instructed the store managers to conduct the illegal transactions. He provided the stores with cash for the illegal transactions from the stores' accounts and set the kickback fee amount. Finally, after the execution of the federal search warrant at the stores, Aguasvivas-Castillo provided instructions to the store managers to gradually reduce the number of and eventually stop the illegal transactions.

B.    The $20 Million Forfeiture

On appeal, Aguasvivas-Castillo makes two arguments that the imposition of a $20 million forfeiture violates the Excessive Fines Clause of the Eighth Amendment, only one of which, an argument as to the disproportionality of the forfeiture, was raised in the district court.

Aguasvivas-Castillo argues, for the first time on appeal, that the $20 million forfeiture is unconstitutional under this court's decisions in United States v. Levesque, 546 F.3d 78 (1st Cir. 2008), and United States v. Jose, 499 F.3d 105 (1st Cir. 2007), because, he newly alleges, it will "deprive [him] of his livelihood." We review only for plain error. Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."); Olano, 507 U.S. at 731-32; Jose, 499 F.3d at 108; see

-18-

also <u>United States</u> v. <u>Fogg</u>, Nos. 09-1094, 09-1132, 2011 WL 5988232, at *4-5 (1st Cir. Dec. 1, 2011) (to be published in F.3d). To establish plain error, Aguasvivas-Castillo must demonstrate that (1) there was error; (2) the error was plain; and (3) the error affected the defendant's substantial rights. <u>Olano</u>, 507 U.S. at 732-35. Where there is plain error, the court must next consider whether the error adversely impacted the fairness, integrity, or public reputation of judicial proceedings. <u>Id.</u> at 735-37.

In <u>Levesque</u>, we held that defendants may raise whether the forfeiture order is so excessive under the Eighth Amendment that it would, in extreme cases, effectively deprive the defendant of his or her future livelihood. 546 F.3d at 83. "This question is separate from the three-part test for gross disproportionality and may require factual findings beyond those previously made by the district court." <u>Id.</u> at 85.

It is the defendant's burden, not the government's, to raise the issue of future deprivation of livelihood. <u>Fogg</u>, 2011 WL 5988232, at *5. Aguasvivas-Castillo neither raised the issue in the trial court nor put facts into the record on the topic. "[A] defendant's inability to satisfy a forfeiture at the time of conviction, in and of itself, is not at all sufficient to render a forfeiture unconstitutional, nor is it even the correct inquiry." <u>Id.</u> (quoting <u>Levesque</u>, 546 F.3d at 85). Even where a "defendant does not have sufficient funds to cover the forfeiture at the time

-19-

of the conviction, the government may seize future assets to satisfy the order." United States v. Hall, 434 F.3d 42, 59 (1st Cir. 2006); see also United States v. Katz, No. 10-1138, 2010 WL 4627872, at *1 (1st Cir. Nov. 15, 2010) (finding no plain error in district court's forfeiture order where defendant argued for the first time on appeal, without citing authority, that "excessiveness" may be established with reference to the financial burden created by the forfeiture order).

As the government notes, the Attorney General and Secretary of the Treasury may remit a forfeiture on the grounds of hardship to the defendant under 21 U.S.C. §§ 853(j), 881(d), and 19 U.S.C. § 1618, should a reason to do so exist. See United States v. Ortiz-Cintrón, 461 F.3d 78, 82 (1st Cir. 2006).

Our review of Aguasvivas-Castillo's second argument, which he raised in the district court, is de novo with due deference given to any factual findings made by the district court. Id. at 81. Aguasvivas-Castillo argues that the forfeiture amount is disproportional to the gravity of his offense.

"A criminal forfeiture is unconstitutional under the Excessive Fines Clause if it is grossly disproportional to the gravity of the defendant's offense." Levesque, 546 F.3d at 83 (quoting United States v. Bajakajian, 524 U.S. 321, 337 (1998) (original quotation marks omitted)). To determine whether a forfeiture is grossly disproportional, courts should consider the

following factors: "(1) whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (2) other penalties authorized by the legislature (or the Sentencing Commission); and (3) the harm caused by the defendant." United States v. Heldeman, 402 F.3d 220, 223 (1st Cir. 2005) (citing Bajakajian, 524 U.S. at 337-40).

The first factor is not at issue: Aguasvivas-Castillo concedes that the criminal statute is principally directed at offenders like him. As to the second, it is true that his gain from the fraud was conservatively estimated at $4.4 million. However, Aguasvivas-Castillo was also convicted of money laundering, which explains the higher forfeiture amount. The penalty amount authorized under the money laundering statute, 18 U.S.C. § 1956(b)(1)(A), is "the value of the property, funds, or monetary instruments involved in the transaction." (Emphasis added). In other words, the total funds "involved in" and "traceable to" the money laundering includes any commingled funds. See United States v. McGauley, 279 F.3d 62, 76-77 (1st Cir. 2002) (citing United States v. Bornfield, 145 F.3d 1123, 1135 (10th Cir. 1998)). As we said in McGauley, "even legitimate funds that are commingled with illegitimate funds can be forfeited if the legitimate funds were somehow involved in the offense, such as by helping to conceal the illegal funds." Id. at 76 (quoting United States v. Baker, 227 F.3d 955, 970 n.4 (7th Cir. 2000); see also

-21-

Bornfield, 145 F.3d at 1135 ("[F]orfeiture of legitimate and illegitimate funds commingled in an account is proper as long as the government demonstrates that the defendant pooled the funds to facilitate, i.e., disguise the nature and source of, his scheme.").

Finally, there was no error in the court's weighing of the harm caused by Aguasvivas-Castillo's crime. Puerto Rico implemented the 25% limit on cash withdrawals on each food stamp recipient's EBT-card in order to ensure that the recipients spend the money on food. The 25% allowance for cash is meant to provide flexibility to individuals for whom finding good prices is especially important. The 75%/25% system is also meant to reduce opportunities for fraud, and was directly subverted by defendant and his co-conspirators. His actions had the real effect of diverting food stamp funds from feeding people and introduced waste into the program.

The deterrent effect of the forfeiture on other certified retailers is also relevant. One study reported that in 2008, 2,725 retailers, approximately 10 percent of all retailers in Puerto Rico, were NAP-certified. Implementing SNAP in Puerto Rico 74.

Aguasvivas-Castillo's actions also normalized the defrauding of the government and the tolerance of criminal behavior. The fraud occurred for many years and it involved numerous food stamp recipients and store employees. All of this was done out of greed by someone in a position of leadership who

-22-

should have been a role model of proper and right behavior. Instead, he was a role model for corruption.  The forfeiture order stands.

### III.

For these reasons, we affirm the sentence and the forfeiture order.

So ordered.