CRENSHAW, Judge.
Celese Gordon was charged with trafficking in oxycodone, 28 grams to 30 kilograms — by possession — and conspiracy to traffic in oxycodone for the same amount, pursuant to section 893.135(1)(c)(1)(c) and 893.135(5), Florida Statutes (2011). Gordon was found guilty of trafficking 14 grams to 28 grams of oxycodone, a lesser-included offense, and guilty as charged on the conspiracy count. She was sentenced to thirty years’ prison on each count to run concurrently with a mandatory term of fifteen years on the trafficking charge and *960 a mandatory twenty-five years on the conspiracy charge. She was also fined $100,000 plus costs on the trafficking charge and $500,000 plus costs on the conspiracy charge. We affirm the judgment and sentence and write only to explain why the fines are constitutional.
I. PRESERVATION
Gordon did not preserve any error as to the fines either by objecting at sentencing or by motion under Florida Rule of Criminal Procedure 8.800(b). See Fla. R. App. P. 9.140(e). In most circumstances, this would bar any review of a sentencing error in this court. See Jackson v. State, 983 So.2d 562, 569 (Fla.2008) (“ ‘[F]or defendants whose initial briefs were filed after the effective date of rule 3.800(b)(2), the failure to preserve a fundamental sentencing error by motion under rule 3.800(b) or by objection during the sentencing hearing forecloses them from raising the error on direct appeal.’ ” (quoting Brannon v. State, 850 So.2d 452, 456 (Fla.2003))). “In other words, for sentencing errors, to raise even fundamental error on appeal, defendants must first file a motion under rule 3.800(b).” Id. However, there is an exception to that rule “applying only to a facial challenge to the constitutionality of a sentencing statute that, at the time the first appellate brief is filed in the case, has not been declared unconstitutional in any appellate decision binding on the trial court.” Brannon, 850 So.2d at 458 (discussing and limiting Harvey v. State, 848 So.2d 1060 (Fla.2003)). This case falls into that narrow exception because it facially challenges as unconstitutional a sentencing statute, and no appellate court has already addressed the issue. Thus, the issue is reviewable.
II. CONSTITUTIONAL CHALLENGE
There is a dearth of caselaw discussing the provisions of the United States and Florida constitutions’ bars to excessive fines. United States v. Bajakajian, 524 U.S. 321, 327, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998) (“This Court has had little occasion to interpret, and has never actually applied, the Excessive Fines Clause [U.S. Const. Amend. VIII].”); see art. I, § 17, Fla. Const. We must determine whether the fine is “ ‘grossly disproportional to the gravity of the defendant’s offense.’ ” United States v. Levesque, 546 F.3d 78, 83 (1st Cir.2008) (quoting Bajakajian, 524 U.S. at 337, 118 S.Ct. 2028). We conclude it is not.
There are three factors we consider to determine whether a fine is “grossly disproportional to the gravity of the defendant’s offense.” Id. “To determine whether a [fine] is grossly disproportional, a court should consider: ‘(1) whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (2) other penalties authorized by the legislature ...; and (3) the harm caused by the defendant.’ ” Id. (quoting United States v. Heldeman, 402 F.3d 220, 223 (1st Cir.2005)).
A. The Class of Persons at Whom the Statute is Directed
The history of the statute Gordon violated provides insight into this first inquiry. Section 893.135, which Gordon was charged with violating, was first enacted in 1979. See Ch. 79-1, § 1, at 9, Laws of Fla. Then it did not look exactly as it does now, with one notable exception. The $100,000 and $500,000 fines were part of the trafficking statute even then. Id. (creating section 893.135(1)(c)(2)-(3)). At that time, the greatest trafficking felony was for amounts 28 grams or more. In 1990, the legislature amended the section to add a cap of 30 kilograms to the then-current offense, and added the life felony of trafficking for amounts 30 kilograms or great *961 er. Ch. 90-112, § 1, at 355, Laws of Fla.[1] Finally, we note that oxycodone itself was not part of the statute but instead was added to the trafficking statute in 1995. See Ch. 95-415, § 5, at 3417, Laws of Fla.; State v. Hayes, 720 So.2d 1095, 1096 (Fla. 4th DCA 1998), quashed 750 So.2d 1 (Fla.1999), superseded by statute Ch. 02-212, § 3, at 1499, Laws of Fla. (codifying § 893.135(7)).
Set in its historical context, it is clearer that Gordon is within the “class of persons at whom the criminal statute was principally directed” regarding both fines. See Levesque, 546 F.3d at 83. “[judgments about the appropriate punishment for an offense belong in the first instance to the legislature.” Bajakajian, 524 U.S. at 336, 118 S.Ct. 2028 (citing Salem v. Helm, 463 U.S. 277, 290, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983))); State v. Adkins, 96 So.3d 412, 416-17 (Fla.2012) (“In considering a challenge to the constitutionality of a statute, [the courts are] ‘obligated to accord legislative acts a presumption of constitutionality and to construe challenged legislation to effect a constitutional outcome wherever possible.’ ” (quoting Fla. Dep’t of Revenue v. City of Gainesville, 918 So.2d 250, 256 (Fla.2005))). While the original meaning of this provision appears to be directed at penalizing drug kingpins and those involved in cartels it is also clear that the legislature saw the offense Gordon committed, that of being a middleman, as a significant crime. Thus, it follows that the legislature would assign a significant fiscal penalty to the crime in order to further disincentivize it. And Gordon’s conduct falls into what was the maximum offense at the time of its creation.
The facts surrounding the offenses Gordon committed are more like those of a middleman than a common dealer. Gordon and her codefendant schemed to commit their crime: they obtained prescriptions for controlled substances through false means and would likely have sold them to persons illegally — both to people without a prescription and without the authority to distribute such pills — had they not been caught. In this case, Gordon’s greater conviction was for conspiracy to traffic in oxycodone, 28 grams to 30 kilograms, based mostly on the 360 pills found with her — an amount it appears is four-to-twelve times as much as the majority of traffickers of oxycodone and hydrocodone. See Off. of Prog. Pol’y Anal. & Gov’t Acct., Opinions Are Mixed About Sentencing Laws for Painkiller Trafficking 4 (Fla. Jan. 2012), available at http://www.oppaga. state.fl.us/MonitorDocs/Reports/pdf/ 1202rpt.pdf) [hereinafter OPPAGA Report ]. She specifically sought to obtain a high-volume prescription through deception in order to take advantage of what law enforcement might refer to as a “pill mill” — those establishments which “routinely prescribe much higher amounts of prescription painkillers, such as 180 oxyco-done pills per month.” See Fla. H.R. Comm, on Judiciary, HB 99 (2014) Staff Analysis 4 n. 21 (Mar. 3, 2014) (quoting OPPAGA Report 4 n. 7). The evidence at trial indicated a street value of ten dollars per pill for a potential total in this case of $3600. While a gross[2] total of $3600 does *962 not rise to the level of a kingpin, it certainly fits within the idea of a middleman. Simply put, the statutory schema indicates the legislature meant to punish both middlemen and kingpins harshly, a policy decision we do not second-guess.[3] We conclude that Gordon’s conduct fits within the statute’s principal direction. Accordingly, this factor militates in favor of not finding the greater fine to be grossly disproportional and thus constitutional.
The $100,000 fine has a similar purpose. Though aimed more at smaller-transaction dealers than the $500,000 fine it, too, is directed at the middleman, as it applies to those in possession of between 14 and 28 grams of illegal drugs. Com/pare 893.135(1)(c)(1)(b) ($100,000 fine for 14-28 grams), with 893.135(1)(c)(1)(a) ($50,000 fine for A-14 grams). With this in mind, it is apparent that Gordon’s lesser offense is also the type the statute is principally directed toward. Because we determine that Gordon’s trafficking offense is that to which the $100,000 fine is principally directed, this counsels in favor of the provision’s constitutionality. In sum, criminalization of conduct like Gordon’s is directed at the middleman — neither street-corner dealer, nor kingpin — and the legislature could treat the different offenses disparately, and harshly, all within constitutional bounds.
B. Other Penalties Authorized
We turn next to the “other penalties authorized by the legislature.” Levesque, 546 F.3d at 83. The authorized penalties for Gordon’s greater crime were fourfold. First, there is a mandatory, minimum sentence of incarceration for twenty-five years’ prison. § 893.135(1)(c)(1)(c), (5). Second, there is forfeiture pursuant to section 893.12. Third, there are mandatory and discretionary court costs imposed by chapter 938 of the Florida statutes, which can amount to a significant sum in their own right.[4] On top of those penalties, there is the mandatory $500,000 fine. § 893.135(1)(c)(1)(c). The fine is not in isolation, and, given the mandatory terms of imprisonment, is not particularly likely to be repaid. Further, the circuit court was without discretion to deviate from the statute because the language is mandatory. See Jones v. State, 700 So.2d 776, 776 (Fla. 2d DCA 1997) (“A trial court has no discretion to dispense with [mandatory] costs.”) (citation and internal quotation marks omitted). Nor was the fine imposed a maximum, but rather the amount is fixed. Accordingly, the trial court had no choice but to sentence Gordon to pay a fine of $500,000 as well as to serve a sentence of at least twenty-five years’ prison.
This same analysis applies to the $100,000 fine. Gordon’s penalties for trafficking in oxycodone 14-28 grams, besides the fine, include a mandatory, minimum prison term of fifteen years, forfeiture, and court costs. Though one factor in the ultimate analysis, the aggregation of the penalties weighs in favor of both fines being grossly disproportional to the offenses committed.
C. Harm Caused by the Defendant
Finally, we must look to the harm caused by the defendant. See Levesque, 546 F.3d at 83. We recognize that “the [l]egislature intended for the state to prosecute traffickers in hydrocodone as zeal *963 ously as it prosecutes those who traffie[ ] in other substances.” Hayes, 720 So.2d at 1096.[5] Conspiracy to traffic is proscribed by the same statute; the statute states that the defendant is punishable as if the offense had been committed. § 893.135(5).
Although the legislature has seen to proscribe conspiracy to traffic in the same statute as actual trafficking, that does not deprive us of our independent obligation to determine whether the “harm caused” impacts the constitutional question, namely excessiveness of the fine. See U.S. v. Mackby, 339 F.3d 1013, 1017 (9th Cir.2003) (“The penalties available ... provide another guide to [defendant’s] level of culpability. The possible penalty available under the [statute] is instructive but not dispositive of the constitutional question.” (citation omitted)). We do not question the legislature’s findings of the potential for drug trafficking or conspiracy to cause harm, and we look to the statute’s intent.
Heldeman, 402 F.3d 220, is instructive. In that case Heldeman pleaded guilty to several fraud offenses and three counts of both conspiracy to distribute drugs and drug distribution. Id. at 221. He was sentenced to forty-six months’ prison and was ordered to forfeit his residence, with equity of $900,000, for having “facilitated” his drug offenses. As stated by the court:
Between October 2000 and December 2002, Heldeman, a New York dermatologist, wrote prescriptions for steroids and Oxycodone (a highly addictive and very strong pain medication) for a number of individuals — many of whom were bodybuilders and some of whom Heldeman had never seen or treated. These prescriptions were medically unnecessary and were of the sort not typically prescribed by dermatologists. For one bodybuilder, Timothy DiPaola, the prescriptions were made out in the names of DiPaola’s friends, so that DiPaola could purchase the drugs with his friends’ insurance and then use them himself. Heldeman also took phone calls from pharmacies to confirm the validity of the prescriptions he had written, and instructed his office manager and nurse to do the same if pharmacists called.
Id. at 221-22. Heldeman undertook such an enterprise because he “received various services of a sexual nature from his clients.” Id. at 222. After first stating that in some forfeiture cases the forfeiture was of less than the statutory maximum, the court noted that some circuits have held that the forfeiture complies with the Eighth Amendment:
However this may be, there are no strong countervailing arguments in favor of Heldeman that would warrant a different result. Heldeman’s offense conduct was not typical of drug dealing and did not involve guns or violence; but it was calculated, repeated, and done for Heldeman’s benefit rather than misguided sympathy, and facilitated access to dangerous substances in the absence of medical need.
Id. Gordon’s offense is similar: like Helde-man’s, no weapons nor violence were used, but it, too, was calculated and done for her own benefit. She, too, acted for her own benefit rather than out of “misguided sympathy” (especially because Gordon is not a medical doctor), and also “facilitated access to dangerous substances in the absence of medical need.” Id. That there was no sale in this case, was of law enforcement’s doing, not Gordon’s.
The harm caused in this case also includes deception in the form of obtaining the prescription — and therefore a greater *964 amount of pills — and the pills themselves, as well as significant harm to potential victims. And it is within common knowledge that prescription painkillers are addictive — thus Gordon could be seen as further victimizing even her “new” victims by selling them something knowing it is addictive in order to maintain a profitable enterprise. See United States v. $180,893 U.S. Currency, 39 Fed.Appx. 570, 573 (9th Cir.2002) (holding there is significant harm in a marijuana grow house operation because “[i]t is an established fact that drug abuse creates a threat to public health and welfare. Given these facts and circumstances, this factor weighs heavily ....”); see also OPPAGA Report at 5 (discussing another report that “cited oxycodone as the drug that caused the most deaths in Florida_ [T]his high[-]strength oxyco-done pill is in the most demand by addicts.”). To be sure, this is itself not proven in this case, but remains relevant to our harm inquiry. As this is a facial challenge, we must look to potential harm caused as well as actual harm caused.
And like Heldeman, Gordon’s offense was also a crime of deception. For example, Gordon sought out the confidential informant in order to commit the crime, and provided the informant with everything she would need. This included cash to pay for the pills, a cover story, a false MRI, and a false prescription history. This only aggravates the harm caused and the gravity of the offense. Therefore this factor, too, militates a determination of the fines not being grossly disproportional.
III. CONCLUSION
In the end, we must conclude the $500,000 fine is valid as not being constitutionally excessive. The crime for which Gordon is being punished is within the principal direction of the statute. We recognize that the fine becomes more significant when aggregated with the other penalties. However, this is outweighed by a significant harm. The $100,000 fine, too, is not unconstitutional, because it is not grossly disproportionate. We recognize that it may appear disproportionate because of the various penalties prescribed and the minimal harm actually caused in this case, but because we recognize that Gordon’s conduct falls within the statute’s principal direction, we cannot say any dis-proportionality is “gross” and therefore constitutionally excessive, especially where the harm caused is limited by law enforcement’s intervention rather than the defendant’s own conduct.
The convictions in this case are affirmed. And because neither the $500,000 fine nor the $100,000 fine is excessive within the proscriptions of the Eighth Amendment to the U.S. Constitution and section 17 of article 1 of the Florida Constitution, we hold they are constitutional.
Affirmed.
NORTHCUTT and SILBERMAN, JJ„ Concur.

. Oddly, when the life felony was added, it did not include a specific fine. As a result, the greatest fine for trafficking is $500,000 and it only applies to cases of trafficking in illegal drugs between 28 grams and 30 kilograms; even now, a person convicted of trafficking a greater amount is not subject to a fine separate from that which is otherwise established by the general fine schema in section 775.083, Florida Statutes. See § 893.135(1)(c)(2), Fla. Stat. (2013). We note that the capital felony of trafficking in illegal drugs carries the same fine, but it requires a victim's fatality. § 893.135(1)(c)(2). Capital importation of illegal drugs also carries the same fine, but requires the importation of 60 kilograms or more and knowing of the probable death of a person. Id. at (1)(c)(3).

. The evidence at trial was clear regarding various costs involved with a prescription drug operation.

. While we are cognizant of the pending reforms to this criminal schema, see Fla. CS for SB 360, § 1 (2014), they do not affect Gordon's 2011 crime. We express no view as to the constitutionality of the pending legislation.

. For example, the 5% surcharge imposed on all fines by section 938.04, Florida Statutes (2011), amounts to $25,000 on the $500,000 fine and $5000 on the $100,000 fine.

. We note that oxycodone and hydrocodone are different drugs but to the extent that they are currently proscribed, it is by the same statute.