# United States Court of Appeals
## For the First Circuit

Nos. 18-1263, 18-1310, 18-1500

UNITED STATES OF AMERICA,

Appellee, Cross-Appellant,

v.

GLENN A. CHIN,

Defendant, Appellant, Cross-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Barron, Stahl, and Lipez,
Circuit Judges.

James L. Sultan, with whom Kerry A. Haberlin and Rankin & Sultan were on brief, for appellant/cross-appellee.

David M. Lieberman, Attorney, Criminal Division, Appellate Section, United States Department of Justice, with whom Andrew E. Lelling, United States Attorney, Amanda P. Strachan, Assistant United States Attorney, George P. Varghese, Assistant United States Attorney, Brian A. Benczkowski, Assistant Attorney General, and Matthew S. Miner, Deputy Assistant Attorney General, were on brief, for appellee/cross-appellant.

July 9, 2020

**BARRON, Circuit Judge.** These consolidated appeals, like those we also decide today in United States v. Cadden, ___ F.3d ___ (1st Cir. 2020) [Nos. 17-1694, 17-1712, 17-2062], concern convictions that stem from a 2012 scandal involving the Massachusetts-based New England Compounding Center ("NECC"). The scandal broke after federal investigators traced the cause of a deadly nationwide outbreak of fungal meningitis and other illnesses to medications that NECC had produced at its facilities. Federal criminal charges were then brought against a number of NECC employees, including the defendant in this case, Glenn Chin, who was NECC's supervising pharmacist at the time. For his role in the scandal, he was convicted in 2017 of numerous federal crimes, and, in consequence, sentenced to a lengthy term of imprisonment, subjected to an order of forfeiture, and ordered to pay restitution.

Chin now challenges two of those convictions, for racketeering and racketeering conspiracy, respectively. He contends that they must be reversed because the evidence did not suffice to support them. He also contends that, in consequence, his prison sentence must be vacated. If he is right about the lack of evidence to support his convictions, then the order of forfeiture also must be reversed.

The government, for its part, brings its own appeal. It challenges the prison sentence that Chin received as well as both

the $175,000 order of forfeiture that the District Court imposed on him and its award of restitution of an as-yet-unspecified amount.

We affirm both of Chin's federal racketeering-related convictions. However, we vacate and remand the prison sentence, the forfeiture order, and the restitution order.

## I.

Our opinion in Cadden addresses the consolidated appeals in the criminal case against Chin's boss and alleged co-conspirator at NECC, Barry Cadden. He was charged in the same indictment as Chin but his trial on those charges was severed from Chin's. See Cadden, ___ F.3d at ___ [slip op. at 7-8]. The issues that we confront here overlap in many respects with those that we address in our opinion in Cadden's case. We thus refer to our reasoning there throughout the analysis that follows. We also refer the reader to that opinion for additional details about NECC's practices and the federal criminal investigation into them. Briefly stated, however, the facts relevant to the appeals in Chin's case are the following.

The practice of compounding involves combining drugs with other substances to produce medications. As a compounding pharmacy, NECC -- which was based in Framingham, Massachusetts -- prepared specialized medications, otherwise unavailable in the

wider market, to hospitals and other medical providers upon their request.

Chin was a trained pharmacist who served as a supervisor at both of NECC's clean rooms. The company's compounding operations that produced the medications tied to the outbreak took place in one of these clean rooms.

On December 16, 2014, following an extensive federal criminal investigation into NECC's role in the outbreak, Chin was charged, along with Cadden and twelve other individuals affiliated with NECC, in a 131-count indictment in the United States District Court for the District of Massachusetts. The indictment charged Chin with racketeering in violation of 18 U.S.C. § 1962(c); racketeering conspiracy in violation of 18 U.S.C. § 1962(d); forty-three counts of federal mail fraud in violation of 18 U.S.C. § 1341; and thirty-two counts of violating the Federal Food, Drug, and Cosmetic Act ("FDCA"), see 21 U.S.C. §§ 331(a), 333(a).

The racketeering charge alleged sixty-eight predicate acts of racketeering to support the allegation that Chin participated in the conduct of NECC through a "pattern of racketeering activity." See 18 U.S.C. § 1962(c). These alleged predicate acts of racketeering included forty-three that were premised on mail fraud allegations, as mail fraud is a racketeering activity. See id. § 1961(1)(B). These allegations corresponded

to the mail fraud allegations set forth in forty-three of the stand-alone mail fraud counts.

The alleged mail fraud entailed NECC misrepresenting its various safety protocols to customers who purchased its medications. Those medications included the contaminated "high-risk" sterile medication, methylprednisolone acetate ("MPA"), that NECC had compounded during Chin's tenure as the supervising pharmacist there and that had given rise to the outbreak. In particular, NECC was alleged to have misrepresented that it had complied with the safety standards set forth in Chapter 797 of the United States Pharmacopeia ("USP-797"), which applies to high-risk sterile compounded medications, including MPA.

The sixty-eight alleged predicate acts of racketeering also included twenty-five that were premised on allegations of second-degree murder, which is itself a racketeering activity. See id. § 1961(1)(A). The allegations of second-degree murder were tied to twenty-five patients who had died from having been injected with the contaminated MPA that NECC had compounded.

The racketeering conspiracy charge did not identify specific predicate acts of racketeering that it alleged that Chin conspired to commit. See id. § 1962(d). Rather, the indictment alleged that Chin conspired to commit a racketeering violation through a pattern of racketeering activity that involved only unspecified instances of mail fraud.

- 6 -

The District Court severed Chin's case from Cadden's and the other defendants'. Chin's case proceeded to trial, and the jury found him guilty on all counts. A special verdict form indicated that, for the purposes of the racketeering offense, the jury found that the government had proved twelve of the sixty-eight alleged predicate acts of racketeering, each of which concerned only mail fraud. The special verdict form expressly made clear that the jury did not find any of the twenty-five alleged predicate acts of second-degree murder, which, again, were relevant only to the racketeering count, not the racketeering conspiracy count. As to the FDCA counts, the special verdict form showed that the jury found that Chin acted with an "intent to defraud or mislead," an aggravating factor, on two of the counts. See 21 U.S.C. § 333(a)(2). It did not so find for the other thirty FDCA counts.

The District Court calculated Chin's sentencing range under the United States Sentencing Guidelines ("Guidelines") to be seventy-eight to ninety-seven months' imprisonment. The District Court then sentenced Chin to ninety-six months' imprisonment. The District Court also issued a forfeiture order against Chin in the amount of $175,000. Finally, the District Court ruled on the government's motion for restitution. It ordered that it would "calculate the total restitution award as the loss suffered by the hospitals and clinics that purchased lots of degraded or defective

- 7 -

drugs during the life of the racketeering enterprise," but stated that it would await the trial of Chin's co-defendants before apportioning the restitution amount among those found guilty and so did not identify a dollar amount for the award of restitution.

The government issued a notice of appeal, and Chin followed suit.

## II.

We begin with Chin's appeal, in which he challenges his convictions for racketeering and racketeering conspiracy.  See 18 U.S.C. § 1962(c), (d).[1]  He contends that each must be reversed due to insufficient evidence.  His sufficiency challenges focus solely on what the record shows -- or, more precisely, fails to show -- about whether a juror reasonably could find satisfied the "pattern of racketeering activity," id. § 1961(5), element that is common to each of the underlying offenses, see id. § 1962(c), (d).

---

[1] The racketeering conviction at issue was based on 18 U.S.C. § 1962(c), which states that

> [i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

The racketeering conspiracy conviction was based on 18 U.S.C. § 1962(d), which states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  The government alleged that Chin conspired to violate § 1962(c).

As we will explain, the challenges to these convictions turn on whether the evidence sufficed to show that NECC was -- as of 2012 -- engaged in a regular business practice of fraudulently representing to its customers that the medications that it was shipping to them had been produced in accord with certain safety standards when in fact they had not been. For, if the evidence did support that conclusion, then a reasonable juror supportably could have found not merely isolated acts of racketeering activity but a "pattern" of it.

We begin with Chin's challenge to the racketeering conviction. We then briefly consider his racketeering conspiracy conviction.

**A.**

Congress has provided little guidance as to the meaning of the "pattern of racketeering activity" element for the offense of racketeering. See id. § 1961(5). It has made clear that there must be at least two predicate acts of racketeering within ten years of one another for there to be a "pattern of racketeering activity." See id. But, the relevant statutory text is otherwise silent as to what makes a pair -- or more -- of individual predicate acts of racketeering a "pattern of racketeering activity."

The United States Supreme Court has fleshed out this "pattern" element in the following ways. First, the Court has made clear that the individual predicate acts of racketeering that

occur within ten years of one another must have been "related" to one another. <u>H.J. Inc.</u> v. <u>Nw. Bell Tel. Co.</u>, 492 U.S. 229, 239 (1989). Second, the Court has made clear that the predicate acts must "amount to or pose a threat of <u>continued</u> criminal activity" to constitute such a "pattern." <u>Id.</u> (emphasis added).

As we have noted, the special verdict form revealed that the jury based its finding of guilt on the racketeering charge on twelve of sixty-eight alleged predicate acts of racketeering and that each of the twelve involved mail fraud.[2] Chin does not dispute that the evidence sufficed to prove those twelve alleged predicate acts of racketeering or that they were "related" to one another.

---

[2] The mail fraud provision under which Chin was convicted and on which his predicate acts were based reads, in relevant part, as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1341.

But, Chin does contend that the evidence did not suffice to permit a juror reasonably to find that they could satisfy the requirement of continuity. For that reason alone, he contends, his racketeering conviction must be reversed for insufficient evidence of a "pattern of racketeering activity." We thus turn our attention to the continuity requirement and what the evidence shows regarding it in Chin's case.

## B.

There are two distinct means by which the continuity requirement may be satisfied. The first requires a showing of "closed-ended" continuity, which depends on a showing that the related predicated acts occurred during "a closed period of repeated conduct." H.J., 492 U.S. at 241. Such closed-ended continuity may be demonstrated "by proving a series of related predicates extending over a substantial period of time" that is nonetheless finite. Id. at 242.

The second type of continuity requires a showing of "open-ended" continuity. Id. at 241. That type of continuity depends on a showing that the related predicate acts constituted "past conduct that by its nature projects into the future with a threat of repetition." Id.

The Supreme Court has provided two examples of what constitutes evidence of open-ended continuity. In the first example, related predicate acts may reflect the kind of open-ended

- 11 -

continuity that suffices to show a "pattern of racketeering activity" because they "involve a distinct threat of long-term racketeering activity," as when a criminal's extortionary demand is accompanied by a promise, implicit or explicit, to regularly make similar illegal requests in the future. Id. at 242. In the second example, related predicate acts may be found to reflect open-ended continuity when they "are part of an ongoing entity's regular way of doing business." Id. The Court has made clear that the entity referenced in the second example may have been, at least in part, a "legitimate business." Id. at 243.

## c.

Chin contends that the evidence did not suffice to support a finding of either closed-ended or open-ended continuity. But, even assuming that Chin adequately preserved this challenge, despite the government's contention to the contrary, and thus that our review is de novo, see United States v. Tanco-Baez, 942 F.3d 7, 15 (1st Cir. 2019), we disagree. As we will explain, a juror could reasonably find on this record that, by the fall of 2012, it had become a regular business practice of NECC to ship medications that had not been prepared in line with the requirements of USP-797 despite representing to customers that they had been.

Significantly, the twelve predicate acts of racketeering that the jury found involved NECC having shipped customers medications that it had falsely told them the company had produced

in compliance with USP-797, and Chin does not dispute that the evidence sufficed to support the finding that such a fraud had been perpetrated in each instance via that particular false representation. Moreover, those twelve predicate acts concerned distinct shipments of medications that had been sent to distinct customers. And while they were all sent within a discrete time period, a juror reasonably could find on this record that the company's practice of fraudulently shipping medications as if they had been produced in compliance with USP-797 had no natural endpoint.

In accord with this conclusion, we note that a former lab technician at NECC, Joseph Connolly, testified that the company "routinely sent medications out prior to getting results back from testing" for sterility, notwithstanding that USP-797 called for NECC to wait for the results of such testing before shipment. In addition, another company employee, Nicholas Booth, testified that it was not necessarily "a common practice" when he started for the company to ship medications without testing them in the manner that USP-797 required, but that, as production ramped up, "corners were cut" and "it started happening more and more." Booth further testified that, by the fall of 2012, the company was sending shipments of untested medications to customers under old labels,

- 13 -

for medications that had been tested, "quite a bit" and that Cadden endorsed the practice.[3]

Chin argues in response that NECC operated safely for more than a decade before cutting corners in response to a brief surge in demand in 2012. Based on the much longer period of safe conduct, he appears to argue, a juror could not reasonably find that mail fraud via false representations of USP-797 compliance was part and parcel of a regular NECC business practice, such that the practice would be an ongoing one.

The jury was tasked, however, with deciding whether the period of fraudulent activity at NECC was of a nature that there was "a realistic prospect of continuity over an open-ended period yet to come." Home Orthopedics Corp. v. Rodríguez, 781 F.3d 521, 531 (1st Cir. 2015) (quoting Feinstein v. Resolution Tr. Corp., 942 F.2d 34, 45 (1st Cir. 1991)). At the very least, the evidence sufficed to permit a juror to find that NECC's regular practice

---

[3] Because our analysis is based only on evidence that relates to the twelve predicate acts found by the jury, Chin's argument, to the extent he makes it, that we may not rely on evidence that relates to other predicate acts not found by the jury is beside the point. In any event, our precedent does not support the proposition on which he relies. See United States v. Connolly, 341 F.3d 16, 26 (1st Cir. 2003) (finding continuity of a racketeering enterprise based in part on "evidence of the existence of the enterprise apart from the specified racketeering acts"); cf. United States v. Cianci, 378 F.3d 71, 93 (1st Cir. 2004) ("The evidence relating to those acts that were found 'unproven' by the jury was still available to the jury in its evaluation of the overall [racketeering] charge.").

- 14 -

was to engage in similar acts in the face of high demand and that demand pressure would have continued to be high going forward.

Chin points to evidence that shows that NECC tried to address the problems in its clean rooms in arguing that NECC's fraudulent scheme was likely to come to an end after the production surge in 2012. But, as Chin himself concedes, some of these efforts were "inadequate," some were "short-lived," and they all "ultimately failed."

Chin also argues that it would have been illogical for NECC to continue to produce medications in a substandard manner indefinitely, given that its business model depended on customers' trust in the safety of its products. But, Chin does not dispute that the twelve predicate acts of mail fraud occurred despite the obvious business risk that they -- like any fraudulent activity, if discovered -- posed to NECC. Thus, a juror reasonably could find that, to whatever extent NECC was incentivized to comply with safety protocols, those incentives were insufficient to cause the company to refrain from fraudulent conduct in the face of high demand from customers.[4]

_____

[4] We note that the jury necessarily concluded in finding that Chin committed twelve predicate acts of racketeering involving mail fraud that he was a "knowing and willing participa[nt] in [NECC's mail fraud] scheme with the intent to defraud," United States v. Soto, 799 F.3d 68, 92 (1st Cir. 2015), and Chin does not dispute that a juror could infer he would have continued to be a knowing and willing participant in that fraudulent scheme if there

Finally, Chin invokes various precedents that have vacated findings of liability for racketeering based on insufficient evidence of open-ended continuity. But, those cases either involve a defendant's attempt to maintain a single contract, see Sys. Mgmt., Inc. v. Loiselle, 303 F.3d 100, 106 (1st Cir. 2002), or a circumstance in which the defendant's alleged fraudulent scheme was limited to a "handful of victims" and was "inherently terminable," Cofacredit, S.A., Inc. v. Windsor Plumbing Supply Co., 187 F.3d 229, 244 (2d Cir. 1999). They are thus readily distinguishable from Chin's case.

In sum, the record fails to support Chin's sufficiency challenge to his conviction for racketeering. Rather, the evidence sufficed to show that NECC's fraudulent scheme of shipping medications as if they had been produced in compliance with USP-797 was an ongoing business practice as of 2012 that showed no signs of abating.

**D.**

There remains Chin's sufficiency challenge to his conviction for racketeering conspiracy. But, the only arguments that he makes in support of that challenge are identical to the ones that we have just rejected. We thus must reject this challenge as well.

---

were a supportable basis for finding that NECC would continue to perpetrate it.

- 16 -

## III.

We now turn to the government's challenges in its appeal. They concern, respectively, the prison sentence that the District Court imposed and the orders of forfeiture and restitution that it issued. We begin with the government's arguments that the District Court erred in calculating the appropriate range for Chin's sentence under the Guidelines. We then take up the government's challenge to the District Court's forfeiture order. We conclude by considering the government's challenge to the District Court's ruling on restitution.

### A.

The government argues that the District Court miscalculated the amount of loss attributable to Chin's illegal conduct under the Guidelines and that the District Court erroneously failed to apply several enhancements under the Guidelines. In assessing these challenges, we review the District Court's "factfinding for clear error and afford de novo consideration to its interpretation and application of the sentencing guidelines." United States v. Benítez-Beltrán, 892 F.3d 462, 469 (1st Cir. 2018) (quoting United States v. Flores-Machicote, 706 F.3d 16, 20 (1st Cir. 2013)).

### 1.

Chin's total offense level was based, in part, on the amount of "loss" attributable to the underlying fraudulent scheme

- 17 -

in which he was found to have been engaged. See U.S.S.G. § 2B1.1(b)(1); see also id. § 2B1.1 cmt. n.3(A)(i) (explaining that "loss is the greater of actual loss or intended loss," where "'[a]ctual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense"). The District Court fixed that loss amount at $1.4 million -- a figure that required the District Court to increase Chin's offense level under the Guidelines by fourteen levels. See id. § 2B1.1(b)(1)(H). The government contends, however, that the District Court erred because it substantially understated the loss amount.

The District Court arrived at the $1.4 million amount by adding up the revenue that NECC had generated in the relevant period from what the District Court described as "every potentially contaminated or degraded drug shipped by NECC from the period beginning in March 2011 to the demise of the company in 2012." The District Court's method for calculating the loss amount was apparently the same one that it used at Cadden's sentencing, and the parties make no argument to the contrary. We thus understand the District Court to have arrived at the loss amount of $1.4 million by, as it had done in Cadden's case, adding up the total NECC revenue generated from sales of medications that were identified as expired, contaminated, nonsterile, sub-potent, super-potent, or compounded by an unqualified technician.

- 18 -

The government takes issue with that approach, as it did in Cadden's case, and contends that the District Court erred by not calculating the loss amount in Chin's case based on the total amount of NECC's sales during the relevant time period. But, the government has failed to show that all of NECC's sales over that period were based on fraudulent representations, just as the government failed to make that showing in Cadden. See ___ F.3d at ___ [slip op. at 66-67]. Nor, as we explained in Cadden, is the government right that revenue that NECC generated from non-fraudulent sales during the relevant time period may be included in the loss amount because customers would not have made the purchases from NECC had they known about NECC's fraudulent sales even if they had not been directly defrauded themselves. See id. at ___ [slip op. at 67-68].

To be sure, shipments in addition to those that the District Court relied on to calculate the loss amount in Chin's case could, perhaps, have been supportably found to have been made fraudulently in their own right. Thus, such shipments could perhaps have been included in the loss amount calculation, thereby generating a figure greater than $1.4 million. The government did not present the District Court in Chin's case, however, with a figure for the loss amount that would have reflected its view of the actual amount that customers paid for the fraudulent shipments made by NECC that would have been less than the greatest loss

- 19 -

amount that it sought but more than the $1.4 million amount. At Chin's sentencing, the government merely advanced its sweeping claim that any NECC sales during the relevant period necessarily constituted "loss." That was so, we note, even though the government was on notice that the District Court was aware of the argument that the government had failed to prove that all NECC products were sold pursuant to a fraudulent scheme from the arguments made at Cadden's sentencing, which preceded Chin's.

Accordingly, much as we concluded when facing the similar issue in Cadden's case, see Cadden, ___ F.3d at ___ [slip op. at 69-70], we hold that the District Court acted well within its discretion in identifying specific shipments that were shown to be fraudulent and using NECC's revenue from those shipments to ground its loss calculation. The District Court was not obliged to speculate on the extent to which NECC's revenues also reflected other fraudulent sales that were not specifically identified by the government. See U.S.S.G. § 2B1.1 cmt. n.3(C) ("The court need only make a reasonable estimate of the loss. . . . [T]he court's loss determination is entitled to appropriate deference."); United States v. Flete-Garcia, 925 F.3d 17, 28 (1st Cir. 2019) ("[A] loss calculation need not be precise: the sentencing court need only make a reasonable estimate of the range of loss."); United States v. Rivera-Rodríguez, 489 F.3d 48, 53 (1st Cir. 2007) ("In arriving at an appropriate sentence, a district court enjoys 'broad

discretion in the information it may receive and consider regarding [a] defendant and his conduct.'" (alteration in original) (quoting United States v. Curran, 926 F.2d 59, 61 (1st Cir. 1991))). We thus decline the government's request to vacate and remand the sentence so that the District Court may undertake the kind of calculation that the government failed to request be made at sentencing.

**2.**

The government next takes issue with the District Court's refusal under the Guidelines to apply the two-level enhancement that kicks in when an "offense involved . . . the conscious or reckless risk of death or serious bodily injury." U.S.S.G. § 2B1.1(b)(16).[5] The District Court found the enhancement inapplicable because Chin had not committed an offense that carried with it the requisite risk identified in the enhancement. The District Court's conclusion rested on an interpretation of the Guidelines, and so we review it de novo. See Benítez-Beltrán, 892 F.3d at 469. We agree with the government that the District Court erred.

The District Court appears to have concluded that, as a matter of law, the enhancement could only apply if Chin had committed a criminal offense that, by its nature, involved the

---

[5] At the time the District Court handed down Chin's sentence in 2018, the enhancement was codified at U.S.S.G. § 2B1.1(b)(15).

- 21 -

conscious or reckless risk of death or serious bodily injury.  The District Court then found that the nature of his offenses did not pose the requisite kind of risk.  According to the District Court, this was so because, with respect to those offenses, the "victims that were identified were the clinics and the hospitals who purchased the drugs," not the patients who were actually put at risk, as those patients "were not recipients of NECC's [fraudulent] representations."

The District Court did go on to consider whether it could find, contrary to the jury, that Chin had committed second-degree murder.  The District Court appears to have thought that offense might carry with it the conscious or reckless risk identified in the enhancement.  But, the District Court concluded, "the evidence did not establish a reckless and knowing disregard of a reasonable certainty of causing death or great bodily harm."  Thus, consistent with the jury verdict, it found that Chin had not committed second-degree murder.

The problem with the District Court's reasoning is the following.  As we explained in Cadden, see ___ F.3d at ___ [slip op. at 71-72], in considering the nature of the risk involved in Chin's "offense," U.S.S.G. § 2B1.1(b)(16), the District Court needed to evaluate the "relevant conduct" for which the Guidelines hold him accountable in relation to the offenses for which he was convicted, id. § 1B1.1 cmt. n.1(I) (defining "offense").  That

- 22 -

"relevant conduct" includes, among other things, "all acts and omissions" that Chin "committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused . . . that occurred during the commission of the offense of conviction." Id. § 1B1.3(a)(1)(A). Thus, Chin was subject to the enhancement so long as his conduct during the commission of the offenses for which he was convicted -- whether federal mail fraud, or racketeering and racketeering conspiracy based on predicate acts of racketeering involving mail fraud[6] -- carried with it the risk identified in the enhancement.

Thus, it is not necessarily determinative -- as the District Court appeared to conclude -- that the direct targets of the mail-fraud-based offenses that he was convicted of committing were hospitals and medical providers and not the patients who were at risk of being hurt downstream. Chin's participation in a scheme to distribute medications that are subject to USP-797 -- including high-risk sterile ones like MPA -- but that are not compounded in compliance with it despite representations to the contrary could potentially constitute "relevant conduct" that "involved . . . the conscious or reckless risk of death or serious bodily injury." Id. § 2B1.1(b)(16). Thus, it was legal error for the District

---

[6] The government does not argue that actions associated with any of the FDCA convictions could serve to make the enhancement applicable.

Court to conclude that such a finding could not trigger the enhancement simply because the patients who might inject those medications were not themselves defrauded and only NECC's direct customers were.

Chin argues that we can nonetheless affirm the District Court. Chin bases that contention on a finding that the District Court made in the course of addressing the jury's determination that Chin did not commit the predicate acts of racketeering activity involving second-degree murder. The finding was that Chin did not act with "a reckless and knowing disregard of a reasonable certainty of causing death or great bodily harm."

Chin asserts that, by finding that he did not have that state of mind, the District Court necessarily found that he did not act, as the enhancement requires, with a "conscious or reckless risk of death or serious bodily injury." Thus, he argues, the District Court necessarily found that this Guidelines enhancement did not apply.

Here, too, the District Court's analysis turns on an interpretation of the Guidelines and thus presents a question of law that we review de novo. See Benítez-Beltrán, 892 F.3d at 469. And, here, again, we agree with the government.

The District Court found that Chin did not act with a "reckless and knowing" state of mind in disregarding a "reasonable certainty of . . . death or great bodily harm." The sentencing

- 24 -

enhancement, however, describes the requisite mental state using disjunctive language: the enhancement applies so long as the defendant acted in spite of either a "conscious or reckless risk." U.S.S.G. § 2B1.1(b)(16)(A) (emphasis added). Thus, the District Court's finding does not foreclose the possibility that Chin's offense involved the mental state necessary for the enhancement's application. We therefore vacate and remand the sentence for the District Court to assess whether any of Chin's relevant conduct, as defined under U.S.S.G. § 1B1.3(a), "involved . . . the conscious or reckless risk of death or serious bodily injury." Id. § 2B1.1(b)(16).

**3.**

We next consider the government's challenge to the District Court's refusal to apply a two-level enhancement that the government requested based on its contention that Chin "knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). We also consider the government's related challenge to the District Court's refusal to apply an additional two-level increase, insofar as that vulnerable victim enhancement applied, based on the government's contention that "the offense involved a large number of" those "vulnerable victims." Id. § 3A1.1(b)(2).

The District Court ruled that the harmed patients were not "victims" within the meaning of either enhancement. It did so

because it determined -- seemingly as a matter of law -- that they could not constitute "victims" because they were not the direct targets of the false representations to company customers on which the mail fraud-based convictions depended. But, reviewing this question of Guidelines' interpretation de novo, see Benítez-Beltrán, 892 F.3d at 469, we agree with the government that, just as we explained in Cadden, "'[t]o come within the guidelines' definition' of 'victim,' 'one need not be a victim of the charged offense so long as one is a victim of the defendant's other relevant conduct,'" ___ F.3d at ___ [slip op. at 75] (alteration in original) (quoting United States v. Souza, 749 F.3d 74, 86 (1st Cir. 2014)).

The "relevant conduct" that the Guidelines hold Chin accountable for engaging in includes, as noted, any action he took during the commission of mail fraud. If, for instance, Chin failed to comply with appropriate safety procedures in compounding the fatal lots of MPA, the patients who died from being injected with those lots could potentially be "victims" of his offense. Thus, the District Court erred in concluding that only individuals who received fraudulent representations from NECC could be "vulnerable victims" for the purpose of the enhancements at issue.

Chin nonetheless urges us to affirm the District Court's decision not to apply these enhancements on an alternative ground. He argues that the patients, even if "victims," are not

"vulnerable" ones. But, because the District Court ruled that the patients could not be victims at all, it has not yet addressed the question. Thus, as in Cadden, we leave it for the District Court to address the issue in the first instance on remand. See ___ F.3d at ___ [slip op. at 76].

In doing so, we pass no judgment on whether Chin's relevant conduct actually justified the application of the enhancement. We thus leave it to the District Court in the first instance to address, among other things, whether his actions were analogous to those of a fraudster who "market[s] an ineffective cancer cure," who the Guidelines indicate would merit the enhancement, U.S.S.G. § 3A1.1 cmt. n.2, and whether the fact that medical providers, not the patients themselves, dealt with NECC directly affects the patients' status as "vulnerable."[7]

**4.**

The government's last challenge to Chin's prison sentence concerns the District Court's refusal to apply the enhancement set forth in U.S.S.G. § 3B1.1. That enhancement increases the offense level of the defendant based on the defendant's "role in the offense." Id.

---

[7] The government does not argue that any conduct associated only with his convictions on the FDCA counts could require the application of the vulnerable victims enhancement.

- 27 -

At sentencing, the government argued that Chin was "an organizer or leader of a criminal activity that involved five or more participants" and that his offense level thus should be increased by four levels. Id. § 3B1.1(a). The District Court found at sentencing, however, that Chin was only "a supervisor or manager" of such an activity, "but not an organizer or leader." See id. § 3B1.1(b). Accordingly, it increased his offense level by only three.

> The District Court reasoned as follows:

> The organizer and leader of the enterprise was Barry Cadden. Consequently, he was given the full four-point upward adjustment. That description does not, however, apply to Mr. Chin. Rather, the evidence established at trial, as the government accurately states on page 12 of its sentencing memorandum, that Mr. Chin was "the supervisory pharmacist at NECC who managed both of NECC's cleanrooms."

The government contends that the District Court erred by concluding that Chin could not have been a "leader" or "organizer" because Cadden had already filled such a role and because of Chin's title as "supervisory pharmacist." Our review is de novo. See Benítez-Beltrán, 892 F.3d at 469.

The government is right that "[t]here can . . . be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1 cmt. n.4. The government is also correct that, in conducting the leader-organizer analysis, "titles such as 'kingpin' or 'boss' are not

- 28 -

controlling."  Id.  Thus, to the extent that the District Court relied only on Chin's title and Cadden's leadership role at NECC in determining that Chin was neither a "leader" nor an "organizer," we agree with the government that the District Court's approach was erroneous.

Chin urges us to conclude, however, that the District Court in the relevant passage at sentencing was referring to "evidence" other than Chin's title and Cadden's place at the top of the NECC hierarchy.  But, while we may affirm the District Court's application of an enhancement where we can infer its reasoning based on "what was argued by the parties or contained in the pre-sentence report," United States v. Sicher, 576 F.3d 64, 71 (1st Cir. 2009) (quoting United States v. Hoey, 508 F.3d 687, 694 (1st Cir. 2007)), we are unable to do so here.

The District Court did not indicate its agreement with the theory that Chin advances on appeal, which is that Chin "had no ultimate decision-making authority" because he took all of his actions "at Cadden's direction."  The record also includes evidence supportably showing that Chin directed other NECC workers to prepare medications in ways that the government alleges were incompatible with representations made by NECC.  See United States v. Carrero-Hernández, 643 F.3d 344, 350 (1st Cir. 2011) ("[T]he defendant must have exercised some degree of control over others involved in the commission of the offense or he must have been

- 29 -

responsible for organizing others for the purpose of carrying out the crime." (quoting United States v. Fuller, 897 F.2d 1217, 1220 (1st Cir. 1990))).  The District Court's description of Chin's conduct as "supervisory" in nature, moreover, is not itself preclusive of a finding that, in performing his supervisory duties, Chin took on the role of an "organizer" within the meaning of the enhancement.  Nor does the pre-sentence report prepared by the United States Office of Probation and Pretrial Services shed any light on the District Court's thinking; that report concluded that Chin was either an organizer or a leader.

Thus, "[g]iven the impact that a possible error would have had on the sentence and the need for further clarification before we can determine whether an error occurred," United States v. Lacouture, 835 F.3d 187, 191-92 (1st Cir. 2016), we decline to affirm the District Court's ruling on the ground Chin proposes. Instead, "we think the wisest course here is to follow our occasional practice" of vacating and "remanding the matter to the district court" in light of the lack of clarity about the basis for the District Court's ruling.  Id.

**5.**

In light of the issues we have identified with the treatment of three enhancements, the District Court may find on remand that application of one or more of these enhancements is warranted and that recalculation of Chin's sentencing range is

necessary.  If it does, then the District Court may of course in imposing a final sentence consider the parties' arguments about how the traditional concerns of sentencing play out given the modified range.  Even if the District Court must reconsider its analysis in these respects, though, we are not thereby inviting the District Court to revisit other conclusions it reached in calculating Chin's sentencing range under the Guidelines that are not affected by our decision today.  Thus, aside from the three enhancements the District Court failed to give a legally adequate rationale for declining to apply, the District Court may not on remand reconsider its initial determinations about whether any adjustments to Chin's total offense level are or are not applicable.

**B.**

We next consider the government's challenge to the forfeiture order.  The government does so on the ground that it rested on an unduly limited view of the amount of funds that could be subject to forfeiture.

Due to his racketeering and racketeering conspiracy convictions, Chin was required to forfeit "any property constituting, or derived from, any proceeds which [he] obtained, directly or indirectly, from racketeering activity."  18 U.S.C. § 1963(a)(3).  At sentencing, the District Court agreed with the government's contention that Chin's salary from NECC provided an

appropriate starting point for the forfeiture calculation and held that Chin's earnings from March of 2010 to October of 2012 were subject to forfeiture. That was the period during which NECC, according to the District Court, was operating as a "criminal enterprise."[8]

Chin earned $473,584.50 in salary over this period of time. The District Court did not require Chin to forfeit this full amount, however. Instead, the District Court limited the forfeiture order to $175,000. The government contends that neither of the two reasons that the District Court gave for limiting the forfeiture order in that way -- one of which was statutory, and one of which was constitutional -- is sustainable. We agree.

## 1.

The District Court first explained that Chin could not be required to forfeit his full salary because he never "obtained" proceeds that were paid as taxes to the United States Treasury within the meaning of 18 U.S.C. § 1963(a)(3). The District Court indicated that, if this reason had been the sole one for reducing the size of Chin's forfeiture order, then it would have reduced

---

[8] The government had requested that Chin be required to forfeit his salary over a longer period of time, stretching back to 2006. On appeal, the government does not challenge the District Court's finding that the relevant period was from March of 2010 to October of 2012.

the forfeiture amount from $473,584.50 to $348,084.60 rather than to the amount of $175,000 to which it ultimately reduced it.

To the extent this question presents one of law, our review is de novo. See United States v. Ponzo, 853 F.3d 558, 589 (1st Cir. 2017). But, "to the extent factual issues are intermingled, [we] consider mixed questions of law and fact under the more deferential clear error standard." Id.

As we explained in Cadden, see ___ F.3d at ___ [slip op. at 81], a defendant convicted of racketeering must forfeit property even when "it has merely been held in custody by that individual and has been passed along to its true owner," United States v. Hurley, 63 F.3d 1, 21 (1st Cir. 1995). Thus, the fact that the offender is required to pay a certain portion of his salary to the federal government as taxes does not affect the fact that he "obtained" that portion.

The District Court expressed concern that, because Chin was forced to forfeit money that he had already paid in federal taxes, he was "being asked, in effect, to pay his taxes twice." But, the purpose of criminal forfeiture -- unlike a federal tax -- is to punish a racketeering offender. See United States v. Bajakajian, 524 U.S. 321, 332 (1998) (noting that "in personam, criminal forfeitures . . . have historically been treated as punitive"); Hurley, 63 F.3d at 21 (viewing "criminal forfeiture [for racketeering] as a kind of shadow fine," where "the size of

- 33 -

the amount transported is some measure of the potential harm from the transaction"). Under our established precedent, an in personam forfeiture order against a racketeering offender is based on the gross amount of proceeds he acquires, even temporarily, and it is thus entirely unremarkable that such a forfeiture order may exceed the net amount of the offender's ill-gotten gains. See Hurley, 63 F.3d at 21. Thus, the District Court's taxes-based reason for reducing the amount of Chin's "proceeds" is not sustainable.

## 2.

The District Court's other reason for reducing the size of Chin's forfeiture order was to avoid an "excessive fine" in violation of the Eighth Amendment of the federal Constitution. See U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."). The District Court acknowledged that Chin and his wife had a net worth of about $423,000 and that the couple had spent almost $700,000 in the sixteen months prior to the entry of the forfeiture order. Nevertheless, the District Court noted the costs that Chin would face in raising his two young children and also concluded that Chin had little prospect of earning a professional-level salary again, given his lack of an education outside of the pharmaceutical industry. The District Court on that basis found that imposing the nearly half-a-million dollar forfeiture would unconstitutionally deprive Chin of the ability to

earn a livelihood in violation of the Excessive Fines Clause.  See Bajakajian, 524 U.S. at 335-36 (1998).

"The factual findings made by the district courts in conducting the excessiveness inquiry . . . must be accepted unless clearly erroneous."  Id. at 336 n.10.  But, we review the question of whether those facts add up to a constitutional violation de novo.  Id.

The government offers a variety of arguments for why the Eighth Amendment does not require the cap imposed by the District Court.  We need focus on only its final one, in which it contends that the District Court's findings do not suffice to show that the full forfeiture amount sought by the government would deprive Chin of the ability to earn a livelihood that the Eighth Amendment limitation on excessive fines protects.

In United States v. Levesque, 546 F.3d 78 (1st Cir. 2008), we considered a challenge to a forfeiture order of more than $3 million by a defendant who claimed to have "nothing of value left to forfeit."  Id. at 80.  Without suggesting that the defendant herself might have a meritorious Eighth Amendment challenge to the size of her forfeiture order, we stated that it was not "inconceivable that a forfeiture could be so onerous as to deprive a defendant of his or her future ability to earn a living, thus implicating the historical concerns underlying the Excessive Fines Clause," and remanded for further proceedings.  Id. at 85.

As the District Court itself noted, however, Levesque made clear that "a defendant's inability to satisfy a forfeiture at the time of conviction, in and of itself, is not at all sufficient to render a forfeiture unconstitutional." 546 F.3d at 85. Levesque also stressed that, "even if there is no sign that the defendant could satisfy the forfeiture in the future, there is always a possibility that she might be fortunate enough to legitimately come into money." Id. (quotations omitted).

As Levesque recognizes, the bar for a forfeiture order to be unconstitutionally excessive on livelihood-deprivation grounds is a high one. The District Court's findings about Chin's net worth, familial obligations, and inability to earn a professional-level salary simply are not sufficient to ground a determination that the full forfeiture order sought by the government would constitute the type of "ruinous monetary punishment[]" that might conceivably be "so onerous as to deprive a defendant of his or her future ability to earn a living" and thus violate the Eighth Amendment's Excessive Fine Clause. Id. at 84-85. Nor has Chin identified any authority to suggest otherwise. Cf. United States v. Sepúlveda-Hernández, 752 F.3d 22, 37 (1st Cir. 2014) (rejecting a challenge to a $1 million forfeiture order on plain error review); United States v. Aguasvivas-Castillo, 668 F.3d 7, 16-17 (1st Cir. 2012) (rejecting a challenge to a $20 million order on plain error review); United States v. Fogg, 666

F.3d 13, 17-20 (1st Cir. 2011) (reversing a District Court's determination that issuing a $264,000 forfeiture order to a defendant who was deeply in debt would be unconstitutional). Accordingly, we vacate the forfeiture order and direct the District Court to enter a forfeiture order in the full amount sought by the government.

## c.

We come, then, to the last of the government's challenges. Here, the government takes aim at a conclusion reached by the District Court in calculating Chin's restitution obligation.

Chin was convicted of an offense "committed by fraud or deceit." 18 U.S.C. § 3663A(c)(1)(A)(ii). The Mandatory Victims Restitution Act ("MVRA") thus required the District Court to order Chin to "make restitution to the victim[s] of the offense or . . . [their] estate[s]." Id. § 3663A(a)(1).

In a preliminary order, the District Court found that the only "victims" entitled to restitution were the "medical facilities who purchased drugs from NECC," but that "the patients who were adversely affected by NECC's drugs" were "not 'victims' . . . under the MVRA's statutory definition." The District Court noted that the "sine qua non of mail fraud" is a scheme to "obtain[] money or property by means of false or fraudulent pretenses, representations, or promises" transmitted to some recipient, see

18 U.S.C. § 1341, and reasoned that NECC's "misrepresentations" were made "to the hospitals and clinics that purchased the drugs," not to "end-users and patients." Thus, the District Court declined to require Chin to pay restitution to patients or insurance companies. It instead deferred calculation of the final restitution amount and thus the imposition of a final order containing that amount until the completion of the trials of Chin's co-defendants. The District Court did indicate, however, as part of Chin's criminal judgment, that restitution to hospitals and clinics would be mandatory.

The government challenges the District Court's narrow construction of who counts as a "victim."[9] We review factual findings underlying a restitution order for clear error and legal

_____

[9] Under our established precedent, we treat a restitution order as an appealable final judgment even when it does not indicate the amount of restitution. See United States v. Cheal, 389 F.3d 35, 51 (1st Cir. 2004) (citing 18 U.S.C. § 3664(o)). Two Supreme Court precedents have subsequently addressed the appealability of a restitution calculation in a deferred restitution scenario such as this one, see Manrique v. United States, 137 S. Ct. 1266, 1270-72 (2017); Dolan v. United States, 560 U.S. 605, 616-18 (2010), but neither of them purports to make a holding about the jurisdiction of appellate courts to hear appeals of preliminary restitution orders, see Manrique, 137 S. Ct. at 1271; Dolan, 560 U.S. at 617-18. No party, however, asks us to conclude from the subsequent Supreme Court precedent that this is the rare case in which we may depart from prior Circuit precedent based on new developments. We thus stick to the law of the circuit as articulated by Cheal, under which we have jurisdiction to consider the government's appeal, notwithstanding that the amount of restitution has not been specified.

conclusions de novo.  See Soto, 799 F.3d at 97.  The final order is reviewed for abuse of discretion.  Id.

The MVRA defines "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered."  18 U.S.C. § 3663A(a)(2).  When an offense "involves as an element a scheme, conspiracy, or pattern of criminal activity," like Chin's mail fraud and racketeering-related convictions, see id. §§ 1341, 1963(c), 1963(d), "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern" is a victim.  Id. § 3663A(a)(2).

We disagree with the District Court's conclusion that patients and insurers were, as a matter of law, not "victims" within the scope of the MVRA.  The restitution analysis focuses on the causal relationship "between the conduct and the loss," not between the nature of the statutory offense and the loss.  United States v. Cutter, 313 F.3d 1, 7 (1st Cir. 2002) (emphasis added) (quoting United States v. Vaknin, 112 F.3d 579, 590 (1st Cir. 1997)); see also Robers v. United States, 572 U.S. 639, 645 (2014) (focusing on the relationship between "the harm alleged" and the defendant's "conduct" (quoting Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 133 (2014))).  This approach to the "victim" analysis tracks the language of the statute, as it focuses on whether the victim was "harmed as a

result of the <u>commission</u> of an offense" or "by the defendant's criminal <u>conduct</u> in the course of [a] scheme, conspiracy, or pattern [of criminal activity]." 18 U.S.C. § 3663A(a)(2) (emphasis added).

Chin nonetheless argues that we must affirm the District Court's ruling for the following reason. The "directly and proximately" language of the MVRA incorporates "a proximate cause requirement." <u>Robers</u>, 572 U.S. at 645 (discussing 18 U.S.C. § 3663A(a)(2)). In assessing whether that requirement has been satisfied, we ask "'whether the harm alleged has a sufficiently close connection to the conduct' at issue." <u>Id.</u> (quoting <u>Lexmark Int'l, Inc.</u>, 572 U.S. at 133); <u>see also</u> <u>Cutter</u>, 313 F.3d at 7 ("[R]estitution is inappropriate if the conduct underlying the conviction is too far removed, either factually or temporally, from the loss."). Put otherwise, the statute asks, "was the harm foreseeable?" <u>Soto</u>, 799 F.3d at 98.

Chin contends that the District Court made a factual finding about the lack of proximate causation, which he would have us review under the deferential "clear error" standard and sustain. We see no indication, however, that the District Court made such a proximate cause finding. It rooted its conclusion that the patients were not "victims" on its reading of the mail fraud statute, and its determination that the "sine qua non" of mail fraud identified the direct recipients of fraudulent

- 40 -

representations as the sole "victims" of such fraud.  It thus did not attempt to evaluate the "factual[] or temporal[]" link between "the conduct underlying the conviction" and "the loss."  Cutter, 313 F.3d at 7.

The District Court did at one point state:

> To the extent that patients may have implicitly relied on NECC's representations by relying on their doctors as learned intermediaries, this additional layer of insulation between NECC and the patient further renders any such reliance "too attenuated" to satisfy the "direct causation" standard of the MVRA. See Cutter, 313 F.3d at 7.

But, the District Court invoked this attenuation concern only to respond to the government's contention that the patients indirectly relied on NECC's representations such that they themselves were defrauded.  We thus do not take the District Court to have engaged in a proximate cause analysis of whether the harm that would flow to the patients from Chin's conduct was foreseeable.  Accordingly, we vacate and remand the restitution order.

## IV.

We **affirm** Chin's convictions and **vacate** and **remand** his sentence, forfeiture order, and restitution order.

- 41 -